J-A22017-24                    2025 PA Super 78

ARMSLIST LLC; TORQUELIST LLC; : IN THE SUPERIOR COURT OF
JONATHAN GIBBON; AND N. : PENNSYLVANIA
ANDREW VARNEY, III :
:
      Appellants :
:
:
:
      v. :
: No. 1307 WDA 2023
:
FACEBOOK, INC. AND INSTAGRAM, :
LLC. :

Appeal from the Order Entered October 6, 2023
In the Court of Common Pleas of Westmoreland County Civil Division at
No(s):  3063 of 2021

BEFORE:  MURRAY, J., McLAUGHLIN, J., and KING, J.

OPINION BY McLAUGHLIN, J.:                    **FILED: APRIL 3, 2025**

Appellants here – Armslist LLC ("Armslist"), Torquelist LLC ("Torquelist"), Jonathan Gibbon, and N. Andrew Varney, III – sued Appellees, Facebook, Inc. ("Facebook") and Instagram, LLC ("Instagram"), claiming that Appellees' removal of their social media accounts violated their rights to free speech under Article I, Section 7 of the Pennsylvania Constitution. They sought declaratory and injunctive relief. Finding no state action, the trial court sustained Appellees' demurrer to the suit and dismissed Appellants' claims with prejudice.

On appeal, Appellants argue that the dismissal was erroneous because they alleged that Appellees' actions were spurred by pressure from members of the United States Congress, such that Appellees' acts constituted acts of

the Commonwealth of Pennsylvania. We conclude that Appellants' assertions are insufficient to allege action of Pennsylvania's government. We also reject Appellants' reliance on a "public forum" theory. We therefore affirm.

We have distilled the following statement of facts from the allegations of Appellants' Second Amended and Supplemental Complaint ("Complaint"), filed December 2, 2021. Because we are reviewing an order sustaining a demurrer, we treat the Complaint's factual allegations as true for purposes of this appeal. ***d'Happart v. First Commonwealth Bank***, 282 A.3d 704, 712 (Pa.Super. 2022).

Armslist operates Armslist.com, an online platform "that allows third parties to communicate regarding buying, selling, and trading firearms and related accessories." Complaint at ¶ 23. Armslist does not buy, sell, or trade firearms itself, but "allows platform users to post their own advertisements" for such transactions. ***Id.*** at ¶ 25. Torquelist operates Torquelist.com, an online platform "that allows third parties to communicate regarding buying, selling, and trading cars, trucks, and automotive parts and accessories." ***Id.*** at ¶ 65. Both companies are solely owned by Gibbon, who is the Chief Executive Officer of both, and both Armslist and Torquelist have their principal place of business in Pennsylvania. Varney is a contractor for Armslist. ***Id.*** at ¶¶ 1-4.

Facebook is a corporation that owns a "social media platform that allows users to share comments, photos, videos, weblinks and other information with other Facebook users who have chosen to receive such posts[.]" ***Id.*** at ¶ 34.

Instagram is a limited liability company that owns another social media platform and is a wholly owned subsidiary of Facebook. *Id.* at ¶¶ 6, 46, 100. Both companies were incorporated/formed in Delaware and have their principal place of business in California. *Id.* at ¶¶ 5-6. Facebook has a service address in Pennsylvania. *Id.* at ¶ 5.

Gibbon, Varney, and Armslist used Appellees' platforms to post political commentary supporting gun rights. *Id.* at ¶¶ 58-62, 109-13. Torquelist posted on Appellees' platforms about automotive regulation. *Id.* at ¶¶ 67-68, 118-19. In 2020, Appellees deleted Gibbon's, Varney's, and Armslist's Facebook and Instagram accounts, and Facebook implemented a policy preventing users from sending "armslist.com" in private messages. *Id.* at ¶¶ 69-73, 120-27. Facebook removed Torquelist's business page in 2020, and Instagram's algorithm has allegedly limited its visibility. *Id.* at ¶¶ 96, 151.

Appellees allegedly took these actions in response to pressure by the media and government officials. *Id.* at ¶¶ 83-85, 137-38, 152. Armslist had come onto national radar due to high-profile suits against it in 2014 and 2018, in which some members of Congress filed an *amicus curiae* brief. *Id.* at ¶¶ 76, 78, 130, 132.

In July 2016,[1] Senator Edward Markey sent a letter to Mark Zuckerberg, the Chief Executive Officer and founder of Facebook, urging Appellees to "prohibit postings for firearms sales." The letter stated,

> I remain deeply concerned that gun sales on Facebook and Instagram — or sales posted online but negotiated and concluded offline — may circumvent or violate state and federal laws, resulting in numerous unlawful sales of handguns, assault weapons, and other firearms. We want all communities, whether online or offline, to be safe for their members. I continue to urge Facebook and Instagram to adopt safe business practices and prohibit postings for firearms sales.

*Id.* at ¶¶ 86, 139 (emphasis omitted).

Other members of Congress also expressed concern and spoke of potential federal regulation. The late Senator Dianne Feinstein "criticized [Appellees] for failing to censor posts and [] threatened more robust federal regulation of Facebook if it fails to provide the censorship that she deems appropriate." *Id.* at ¶¶ 92, 145. The Complaint states that Senator Feinstein sat "in a position to regulate [Appellees] and [their] own access to immunity under Section 230 of the Communications Decency Act."[2] *Id.* at ¶¶ 92, 145. Senator Sheldon Whitehouse "has stated that he wants to know 'how [Facebook] plan[s] to prevent bad actors from using ads to secretly spread misinformation.'" *Id.* at ¶¶ 93, 146.

---

[1] The Complaint gives the date as November 2013, but provides an internet link to the letter giving a July 2016 date. Complaint at ¶¶ 86, 139.

[2] *See* 47 U.S.C. § 230.

In February 2020, shortly after Appellees began acting on Appellants' accounts, 13 U.S. Senators sent a letter to Zuckerberg, stating, "[I]t is not enough to simply ban [direct gun] sales. Effective monitoring, including the suspension of accounts in violation of these policies, is essential." *Id.* at ¶ 86. The senators asked Zuckerberg to identify the measures Facebook had "in place to ensure that if it permanently suspends a private group for violating the gun sale policy, users from that group cannot create another private group under a different name[.]" *Id.* They also inquired about the "proactive measures" Facebook was "taking to ensure that users in private groups are not able to skirt Facebook's ban on gun sales, including referring potential buyers to apps such as WhatsApp, Snapchat, Wickr, or any alternative communication platform[.]" *Id.*

The following year, in March 2021, 23 members of Congress sent a letter to Zuckerburg demanding that Facebook "immediately examine its advertising practices and make substantive changes to its policies to avoid future instances of [firearm] ad placements and targeting that promote violence." *Id.* at ¶¶ 87, 140.

Approximately six months later, in August 2021, Senator Feinstein, along with Senator Whitehouse and Senator Richard Blumenthal, "issued a press statement announcing legislation specifically directed at Armslist" that would ensure that Armslist would no longer enjoy blanket immunity under the federal Communications Decency Act. *Id.* at ¶¶ 88-89, 141-42.

In sum, according to Appellants, Appellees' actions were "politically motivated" and "aimed at quelling criticism of, and potential action against, [Appellees] by government actors, as well as by certain media and advocacy groups." *Id.* at ¶¶ 188, 203.

The Complaint also alleges that Appellees hold their social media platforms out as public forums. *Id.* at ¶¶ 182, 196. Facebook provides a free service that allows its users to "create content that, unless rendered private by the user, is publicly available," both within the platform and in search engine results. *Id.* at ¶¶ 39, 40. Facebook's Terms of Service state that its "mission is to give people the power to build community and bring the world closer together," and that its services aim to help users "find and connect with people, groups, businesses, organizations, and others that are important to" them. *Id.* at ¶ 48. Facebook's Community Standards likewise state that Facebook's goal

> has always been to create a place for expression and give people a voice. This has not and will not change. Building community and bringing the world closer together depends on people's ability to share diverse views, experiences, ideas and information. We want people to be able to talk openly about the issues that matter to them, even if some may disagree or find them objectionable.

*Id.* at ¶ 52.

At the same time, Facebook's Terms of Service advise users that Facebook will disable an account in "situations where [it] may be able to help support or protect [its] community":

People will only build community on Facebook if they feel safe. We employ dedicated teams around the world and develop advanced technical systems to detect misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community. If we learn of content or conduct like this, we will take appropriate action - for example, offering help, removing content, removing or restricting access to certain features, disabling an account, or contacting law enforcement. We share data with other Facebook Companies when we detect misuse or harmful conduct by someone using one of our Products.

*Id.* at ¶ 48. Facebook also has certain restrictions in place for safety and authenticity reasons, such as requiring users to use their own names, and not allowing accounts for persons under 13 years old or for those convicted of sexual offenses. *Id.* at ¶ 53. The Terms of Service also state that Facebook controls the "posts, stories, events, ads and other content" users see in their News Feeds, based on users' personal data and settings. *Id.* at ¶ 48.

Similarly, Instagram's Terms of Use state that its mission is "[t]o bring you closer to the people and things you love," and that Instagram wants "to continue to be an authentic and safe place for inspiration and expression." *Id.* at ¶¶ 102-03. Like Facebook, Instagram claims to "highlight content, features, offers, and accounts" each user may be interested in, based on personal data. *Id.* at ¶ 102. It also employs "teams and systems that work to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior." *Id.*

Nonetheless, Instagram's Community Guidelines state that it will occasionally allow content that goes against its guidelines "after weighing the public interest value against the risk of harm":

Instagram is a reflection of our diverse community of cultures, ages, and beliefs. We've spent a lot of time thinking about the different points of view that create a safe and open environment for everyone. In some cases, we allow content for public awareness which would otherwise go against our Community Guidelines – if it is newsworthy and in the public interest. We do this only after weighing the public interest value against the risk of harm and we look to international human rights standards to make these judgments.

*Id.* at ¶ 104. Instagram warns it will disable or restrict accounts "to protect our community or services," or if a user "create[s] risk or legal exposure" for it:

We can remove any content or information you share on the Service if we believe that it violates these Terms of Use, our policies (including our Instagram Community Guidelines), or we are permitted or required to do so by law. We can refuse to provide or stop providing all or part of the Service to you (including terminating or disabling your access to the Facebook Products and Facebook Company Products) immediately to protect our community or services, or if you create risk or legal exposure for us, violate these Terms of Use or our policies (including our Instagram Community Guidelines), if you repeatedly infringe other people's intellectual property rights, or where we are permitted or required to do so by law. We can also terminate or change the Service, remove or block content or information shared on our Service, or stop providing all or part of the Service if we determine that doing so is reasonably necessary to avoid or mitigate adverse legal or regulatory impacts on us.

*Id.* at ¶ 106. Like Facebook, Instagram does not allow users under 13 years old or who are convicted sex offenders. *Id.* at ¶ 105.

Appellants sought a declaration that Appellees' actions violated their free speech rights under the Pennsylvania Constitution. *Id.* at ¶¶ 191, 207.

They also sought to enjoin Appellees from continuing to bar them from their platforms. *Id.* at ¶¶ 193, 209.[3]

Appellees filed Preliminary Objections. Relevant here, Appellees objected that the Complaint failed to state a claim on which relief could be granted. They argued that Appellees are not state actors, but private entities, and that their platforms are not public forums for the purposes of free speech.

The court sustained Appellees' demurrer "based on the argument that they are not state actors subject to enforcement of the Pennsylvania Constitution." Order of Court, 10/6/23, at 2 (unpaginated), ¶ 3. The court found that even taking Appellants' allegations as true, "there is no precedent that supports a finding that constitutional restraints apply to a private entity (which [Appellees] are) and the exceptions that have been recognized do not apply to the facts of this case." *Id.* The court dismissed the case with prejudice.

Appellants appealed, raising the following issues.

I. Whether the trial court misapplied the preliminary objections standard by failing to properly accept as true and draw reasonable inferences from the allegations in Appellants' Complaint demonstrating that government officials coerced or significantly encouraged Facebook and Instagram into restricting and removing Appellants' accounts on their platforms, thus making Facebook and Instagram state actors under Article I, Section 7 of the Pennsylvania Constitution.

II. Whether the trial court erred as a matter of law by failing to accept as true Appellants' allegations demonstrating that

---

[3] While the Complaint listed four counts, Appellants later discontinued all except those for declaratory judgment and injunctive relief.

> Facebook and Instagram's platforms are *de facto* public forums under established Pennsylvania law, and as such erred in sustaining Appellees' preliminary objections related to Appellants' claim for declaratory and injunctive relief recognizing that Appellees' actions restricting and removing Appellants' social media accounts infringed Appellants' free speech rights under Article I, Section 7 of the Pennsylvania Constitution.

Appellants' Br. at 5-6.[4]

Appellants first argue that the court should have inferred from the allegations in the Complaint that officials of the federal government significantly encouraged and coerced Appellees into censoring Appellants' speech, which Appellants contend qualifies as state action. **Id.** at 25-27 (citing **Missouri v. Biden**, 83 F.4th 350 (5th Cir. 2023), *rev'd and remanded sub nom.* **Murthy v. Missouri**, 603 U.S. 43 (2024)). Appellants highlight their allegations that Senator Markey "urged Facebook and Instagram to adopt safe business practices," and Senator Feinstein directly threatened Appellees by instructing them to "fix" a perceived problem "before the feds do it for you." **Id.** at 32. They argue the fact that a government official lacks direct regulatory authority over Appellees is not dispositive of whether that official significantly encouraged or coerced Appellees to act. **See** Appellants' Reply Br. at 9 (citing **Okwedy v. Molinari**, 333 F.3d 339 (2d Cir. 2003) (*per curiam*)). They also point to their allegations that a group of senators later expressly instructed

---

[4] Appellees argue we should affirm the trial court's dismissal based on the demurrer, and, alternatively, that we should affirm dismissal based on Appellees' other preliminary objections that the court overruled – *i.e.*, their objection to venue and their claim of a statutory defense. Because we affirm the trial court's sustaining the demurrer, we need not address whether the court could have dismissed the case on alternative grounds.

Facebook to examine its advertising practices, and other senators proposed legislation amending Section 230, directed at Armslist.

Appellants argue that, in combination, these allegations established "a regulatory atmosphere that was overtly hostile to the type of Second Amendment speech [Appellants] engaged in[.]" *Id.* at 6. Appellants argue that the court should have inferred that Appellees deleted Appellants' accounts due to "extensive pressure by government officials with the power to regulate Facebook and Instagram[.]" Appellants' Br. at 33; *see also* Appellants' Reply Br. at 10. Appellants also assert "it would be impossible for [them] to have first-hand knowledge of private conversations between governmental officials and [Appellees]." Appellants' Br. at 34. They therefore claim the court should have overruled the Preliminary Objections and allowed them to engage in discovery to obtain proof of coercion by state officials that occurred "behind closed doors," based on the information and belief in the Complaint. Appellants' Reply Br. at 8; *see also* Appellants' Br. at 29, 34.

In their second issue, Appellants argue "Pennsylvania law has long held that individuals enjoy broad free speech protections under the Pennsylvania Constitution, even in privately owned spaces," where those private spaces are offered as public forums. Appellants' Reply Br. at 11 (citing *Commonwealth v. Tate*, 432 A.2d 1382 (Pa. 1981)). They assert Appellees hold their social media platforms out as community spaces and they have become the "modern-day versions of the founding-era town square," to which Appellants have a right of access. Appellants' Br. at 37, 42-43; *see also* Appellants' Reply

Br. at 12 (referring to Appellees' platforms as "the home of civic public discourse in modern society," and citing **Packingham v. North Carolina**, 582 U.S. 98 (2017)).

In relation to both arguments, Appellants assert the Pennsylvania Constitution provides greater free speech protections than the U.S. Constitution. Appellants' Br. at 22-23, 38-41 (citing **Pap's A.M. v. City of Erie**, 812 A.2d 591 (Pa. 2002), **Tate**, and **William Goldman Theatres, Inc. v. Dana**, 173 A.2d 59 (Pa. 1961)).

### Standard of Review

"In considering an appeal from an order sustaining a demurrer, which presents a question of law, our standard of review is *de novo* and our scope of review is plenary." **Riemenschneider v. D. Sabatelli, Inc.**, 277 A.3d 612, 614 (Pa.Super.), *appeal denied*, 288 A.3d 480 (Pa. 2022). We must determine "whether, on the facts averred, the complaint adequately states a claim for relief under any theory of law." **Id.** (quotation marks and citation omitted). We take as true "[a]ll material facts set forth in the pleading and all inferences reasonably deducible therefrom[.]" **d'Happart**, 282 A.3d at 712 (citation omitted).

### Issue I

In their first issue, Appellants argue that the court should not have sustained the demurrer on state action grounds because the facts alleged in the Complaint establish that members of Congress coerced or significantly

encouraged Appellees into restricting and removing Appellants' accounts. We disagree.

Appellants' state action argument suffers from a basic difficulty. Appellants never address the fundamental incongruity of arguing that private activity taken due to pressure from legislators of another sovereign – here, Facebook's and Instagrams' alleged limiting of Armslist's and Torquelist's accounts due to pressure from members of the United States Congress – could somehow be deemed to be the action of the Commonwealth of Pennsylvania. After all, the Pennsylvania Constitution's "Declaration of Rights is a limitation on the power of state government," not the federal government. ***W. Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.***, 515 A.2d 1331, 1335 (Pa. 1986) ("***Western Pennsylvania II***") (plurality).

In any event, Appellants' state action arguments fail. In interpreting the Pennsylvania Constitution, Pennsylvania courts are "not bound by decisions of the U.S. Supreme Court" on similar federal doctrines, and may find that Pennsylvania's rules on those issues differ from federal rules. ***Pap's A.M.***, 812 A.2d at 601. We need not engage in a full-blown ***Edmunds***[5] analysis here. The Supreme Court has opined at length on the history of Article I, Section 7,

---

[5] Pursuant to ***Commonwealth v. Edmunds***, 586 A.2d 887, 895 (Pa. 1991), when construing provisions of the Pennsylvania Constitution, courts "should consider: the text of the relevant Pennsylvania Constitutional provision; its history, including Pennsylvania case law; policy considerations, including unique issues of state and local concern and the impact on Pennsylvania jurisprudence; and relevant cases, if any, from other jurisdictions." ***Pap's A.M.***, 812 A.2d at 603.

and Appellants offer no broader analysis. *See Oberholzer v. Galapo*, 322 A.3d 153, 173 (Pa. 2024); *Pap's A.M.*; *Western Pennsylvania II*; *Tate*; and *William Goldman Theaters, Inc.*[6] Moreover, Appellants argue that Pennsylvania's state action doctrine is consistent with federal law,[7] and an *Edmunds* analysis is only necessary "when interpreting a provision of the Pennsylvania Constitution that is invoked in support of a departure from federal law[.]" *Wharton*, 263 A.3d at 569 (quoting *Jubelirer v. Rendell*, 953 A.2d 514, 523 (Pa. 2008)).

Although they are not binding, the tests for state action under the federal constitution may prove helpful and "consistent with Pennsylvania law" for resolving questions of state action arising under the Pennsylvania Constitution. *W. Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.* ("*Western Pennsylvania I*"), 485 A.2d 1, 7 (Pa.Super. 1984), *aff'd*, *Western Pennsylvania II*; *see also DePaul v. Commonwealth*, 969 A.2d 536, 547 (Pa. 2009) (stating, "reference to First Amendment authority remains instructive in construing Article I, Section 7"). Therefore, having been presented with no controlling authority regarding whether we may find state

---

[6] Appellants do not organize their argument according to the *Edmunds* factors. However, "the *Edmunds* factors were adopted as a guide and not a talisman," *Commonwealth v. Bishop*, 217 A.3d 833, 843 (Pa. 2019), and a litigant's failure to brief each of these factors does not waive a departure claim. *See Commonwealth v. White*, 669 A.2d 896, 899 (Pa. 1995). Furthermore, Appellants do not argue for a departure from federal law, making an *Edmunds* analysis unnecessary. *Wharton*, 263 A.3d at 569.

[7] *See*, *e.g.*, Appellants' Br. at 24.

action due to governmental coercion of private intermediaries under Article I, Section 7 of the Pennsylvania Constitution, and no persuasive basis for departure, we will review federal decisions in this area.

While government officials may "forcefully [condemn] views with which they disagree," the First Amendment prohibits them from "us[ing] the power of the [s]tate to punish or suppress disfavored expression." ***Nat'l Rifle Ass'n of Am. v. Vullo***, 602 U.S. 175, 180, 188, 198 (2024). Accordingly, under federal jurisprudence, private action may be attributable to the state when it "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [s]tate." ***Blum v. Yaretsky***, 457 U.S. 991, 1004 (1982). "To state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." ***Vullo***, 602 U.S. at 191. Relevant inquiries for a governmental coercion claim include the extent of the power wielded by the government official, whether the communications from the official can reasonably be understood as a threat or inducement, and the third party's reaction. ***Id.*** at 189 (citing ***Bantam Books, Inc. v. Sullivan***, 372 U.S. 58 (1963)), 191-93 (applying factors).[8]

_____

[8] Governmental coercion is often analyzed in cases asserting the government directly coerced the speaker to suppress their own speech, rather than a
*(Footnote Continued Next Page)*

- 15 -

For example, in **Vullo**, the superintendent of the New York Department of Financial Services, which regulates insurance companies, threatened to penalize private insurance companies for unrelated technical infractions unless those companies ceased providing insurance to the National Rifle Association. **Id.** at 183. The Supreme Court found these allegations stated a claim for state action by governmental coercion of a private party.

The Court drew on an earlier decision, **Bantam Books**, where a state commission threatened to recommend a book distributor for criminal prosecution unless it stopped selling certain publications. **Id.** at 188-89 (discussing **Bantam Books**). The Court explained that "the coerced party reasonably understood the commission to threaten adverse action, and thus

_____

private intermediary. These cases similarly consider whether the government's communication could be reasonably perceived as a threat of adverse consequences. **See Bartley v. Taylor**, 25 F.Supp.3d 521, 532 (M.D. Pa. 2014) ("where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory") (citation omitted, italics removed). **Compare R.C. Maxwell Co. v. Borough of New Hope**, 735 F.2d 85, 88-89 (3d Cir. 1984) (finding no governmental coercion where Borough Council of New Hope threatened Citibank with civil administrative proceedings under a zoning ordinance unless it removed billboards; the letters reflected the community's distaste for the billboards and were "devoid of enforceable threats" as the ordinance had not yet been drafted), **with Platt v. Graham**, No. 1:19-CV-1829, 2020 WL 6551218, at *4-*5 (M.D. Pa. Nov. 6, 2020) (finding government retaliation where borough zoning officer threatened business owner with reinstating zoning violation after he spoke out against code officer, because communication implied a punishment, sanction, or adverse regulatory action would follow business owner's exercise of free speech).

its compliance with the commission's directives was not voluntary." ***Id.*** at 189 (cleaned up).[9]

Pursuant to these standards, we conclude that the allegations in the Complaint do not state a claim for governmental coercion. First, the allegation that Armslist became the subject of lawsuits and the disproval of the media is plainly inadequate and irrelevant to the question before us. ***See*** Complaint at ¶¶ 76-82. This clearly was not government action.

---

[9] ***See also Okwedy***, 333 F.3d at 344 (finding allegations supported inference of governmental coercion where borough president wrote letter to owner of controversial billboards, recognizing the owner "derives substantial economic benefits" from the billboards, and asking the owner to contact his legal counsel and "chair of [his] Anti-Bias Task Force"); ***Am. Civ. Liberties Union v. City of Pittsburgh***, 586 F.Supp. 417, 422-23 (W.D. Pa. 1984) (finding governmental coercion where mayor issued letter to magazine and news vendors urging them to stop selling magazine or risk criminal proceedings); ***cf. Children's Health Defense v. Meta Platforms, Inc.***, 112 F.4th 742, 760 (9th Cir. 2024) (finding allegations did not support inference of governmental coercion where members of Congress criticized social medial platforms for allowing misinformation and threatened to hold them "accountable;" the statements "do not support the inference that the government pressured Meta into taking any specific action with respect to speech about vaccines" and only supported the inference that "Meta was aware of a generalized federal concern with misinformation on social media platforms and . . . took steps to address that concern"; finding governmental action was not present even if social media company implemented policies "at least in part to stave off lawmakers' efforts to regulate"); ***O'Handley v. Weber***, 62 F.4th 1145, 1158 (9th Cir. 2023) (finding no governmental coercion where state agency asked Twitter remove plaintiff's posts but did not intimate Twitter would suffer adverse consequences if it refused the request); ***Kennedy v. Warren***, 66 F.4th 1199, 1207-08 (9th Cir. 2023) (finding no governmental coercion where senator wrote letter to Amazon requesting it modify its algorithm so consumers would not be directed to book about COVID-19 and suggesting Amazon was engaging in "potentially unlawful" conduct; letter was authored by single member of the legislature and Amazon would not have reasonably believed "that a single member of Congress could bring to bear coercive government power against it").

Next, the Complaint states that in 2013, seven years before Appellees took action on Appellants' accounts, Senator Markey sent a letter to Zuckerberg, asking him to prohibit posts for direct or indirect firearms sales on Appellees' platforms. *Id.* at ¶ 86, 139. This letter threatened no adverse consequences, and therefore does not rise to the level of government coercion. Similarly, the allegation that Senator Whitehouse has stated that he wants to know "how [Facebook] plan[s] to prevent bad actors from using ads to secretly spread misinformation," *id.* at ¶¶ 93, 146, includes no threat of adverse governmental action.

The Complaint further alleges that in 2018, Senator Feinstein threatened to increase federal regulation over Facebook if it failed to "provide the censorship that she deems appropriate." *Id.* at ¶¶ 92, 145. However, the Complaint does not allege that Senator Feinstein was asking Appellees to censor posts related to firearms sales, let alone limit Appellants' activity. Nor did her statement threaten immediate adverse governmental action against Appellees. To the contrary, her statement concedes that Appellees currently enjoy immunity under Section 230. That a sitting senator "threatened" to introduce legislation that had no bearing on Appellants' speech and that would need to pass through Congress and be signed into law before enforced against Appellees is too attenuated to be reasonably construed as a threat of immediate adverse action. Nor was the Senator's 2018 statement temporally close enough to Appellees' actions in 2020 as to establish a causal link

between the threat to introduce legislation regulating Appellees for unrelated reasons and Appellees' removal of Appellants' accounts.

Next, the Complaint alleged that in February 2020, shortly after Appellees began removing Appellants' accounts, 13 U.S. Senators sent a letter to Zuckerberg stating, "it is not enough to simply ban [direct gun] sales," and asking to know the protections Facebook has in place to prevent users from skirting Facebook's "gun sale policy." *Id.* at ¶¶ 86, 139. Not only do these statements fail to threaten adverse governmental consequences, but they also suggest that Appellees already had a policy against the use of the platform to facilitate gun sales, before any alleged governmental "coercion." The allegations thus tend to show that rather than bowing to government pressure, Appellants were exercising their independent judgment in removing or restricting the accounts according to their policies reserving the right to remove content in the interest of community protection.

Finally, the Complaint alleges that after Appellees removed Appellants' accounts, Senators Feinstein, Whitehouse, and Blumenthal introduced legislation aimed at eliminating Armslist's Section 230 immunity. This was not a communication directed at Appellees and did not threaten any adverse action against them. Moreover, it occurred after the accounts' removal.

Taking Appellants' allegations as true, the Complaint does not plead facts showing that the government "exercised coercive power or . . . provided such significant encouragement, either overt or covert," that Appellees'

actions "must in law be deemed to be that of" the Commonwealth of Pennsylvania. **Blum**, 457 U.S. at 1004.

We further reject Appellants' argument that the case should have proceeded to discovery to allow them to discover whether governmental coercion occurred "behind closed doors." In Pennsylvania, a complaint must aver the essential facts that, if true, would support granting the demand for relief. **See Bricklayers of W. Pa. Combined Funds, Inc. v. Scott's Dev. Co.**, 90 A.3d 682, 694 & n.15 (Pa. 2014); **McShea v. City of Phila.**, 995 A.2d 334, 339 (Pa. 2010); Pa.R.C.P. 1019(a) ("The material facts on which a cause of action or defense is based shall be stated in a concise and summary form"). To allege that Appellees must have removed their accounts because some unknown governmental official, at some unknown time and place, threatened them with some unknown adverse consequences falls far short of Pennsylvania's fact pleading requirements.

### Issue II

In their second issue, Appellants argue Appellees' actions violated their free speech rights under the Pennsylvania Constitution because Appellees' social media platforms are *de facto* public forums. Appellants maintain that **Commonwealth v. Tate**, 432 A.2d 1382 (Pa. 1981), is controlling.

In **Tate**, a private college hosted a symposium featuring a controversial public official. The college invited the public to attend and charged a nominal registration fee. The college had no policy prohibiting off-campus visitors, and non-students frequented campus. Prior to the symposium, a group of political

protestors requested permission to distribute leaflets outside the entrance of the main symposium building. The college "summarily refused." *Id.* at 1385. The record revealed that the college believed it was entitled to grant or deny such permits arbitrarily. *Id.* at 1387. On the day of the symposium, the protestors distributed leaflets on campus, despite not having permits to do so. The college had them arrested, and the trial court convicted them of defiant trespass. *Id.* at 1383-87. The trial court rejected a defense codified in the defiant trespass statute that applies when "the premises were at the time open to members of the public and the actor complied with **all lawful conditions** imposed on access to or remaining on the premises." 18 Pa.C.S.A. § 3503(c)(2) (emphasis added). The court found that the protestors had not complied with the permit requirement.

On appeal, the Pennsylvania Supreme Court concluded that in view of "the affirmative defense provided by the trespass statute," and the free speech and petition rights under the Pennsylvania Constitution, the defiant trespass convictions were invalid. *Tate*, 432 A.2d at 1384. The Court defined the narrow issue as whether the "standardless permit requirement" was "a lawful condition." *Id.* at 1387. The Court observed that the Pennsylvania Constitution protects both the right to free speech and the right to own property, and found it was called on to balance those interests. *Id.* at 1389-90 (citing Article I, Sections 1 and 7). It considered that although the college was privately funded, it "serve[d] in many respects as a community center for Allentown," and, on the day in question, "provided a public forum for . . . a

- 21 -

controversial public figure." *Id.* at 1387, 1390. Departing from the First Amendment, the Court held that under Article I, Section 7, an owner of private property made available to the public may only impose reasonable, content-neutral restrictions on the "mode, opportunity and site" for speech and assembly. *Id.* at 1390 (quoting *State v. Schmid*, 423 A.2d 615, 630 (N.J. 1980)) & n.14. It thus concluded that the college's "standardless" permit requirement was not a condition "lawful[ly]" imposed on the demonstrators who, "wished to communicate peacefully and unobtrusively in an area normally open to the public," and reversed the judgments of sentence. *Id.* at 1390-91.

The Pennsylvania Supreme Court discussed *Tate* in *Western Pennsylvania II*. No single opinion in *Western Pennsylvania II* garnered a majority. The Court there was considering whether, under the Pennsylvania Constitution's guarantees of free speech and petition, the trial court had properly refused to enjoin a shopping mall from prohibiting the collection of signatures for a gubernatorial nominating petition on the mall's private property. *Western Pennsylvania II*, 515 A.2d at 1333. The owner of the mall had denied the plaintiffs permission to solicit signatures on the basis that it uniformly prohibited all political solicitation. No criminal charges were brought against those collecting signatures. "Rather than risk criminal prosecution," the plaintiffs sought an injunction to stop the mall from enforcing its policy. *Id.* The trial court denied relief.

The Supreme Court affirmed. The opinion announcing the judgment of the court ("OAJC") was authored by Justice Hutchinson and joined only by Justice Flaherty. The OAJC concluded that the Pennsylvania Constitution does not guarantee the public free speech rights on private property where "the owner uniformly and effectively prohibits all political activities and similarly precludes the use of its property as a forum for discussion of matters of public controversy." *Id.* Recognizing that disputes between private parties are primarily resolved through civil, rather than constitutional, law, the OAJC found no need to balance the rights of the parties because of "the absence of governmental action." *Id.* at 1334 n.2, 1335. It emphasized that the case "involved a request for affirmative state action to open private property to appellants' activities, not a defense against governmental prosecution for them." *Id.* at 1337 n.6. It observed that the legislature controls the "exercise of the Commonwealth's police power." *Id.* at 1339.

There were three concurrences and one concurrence in part. (Justice Papadakos did not participate.) In the first concurrence, Justice Larsen cited his dissent in *Tate* reasoning that a private entity should have the right to exclude any private persons from entering its property. He particularly thought that the balancing of constitutional interests "vis-a-vis private citizens" was improper, created confusion and uncertainty, "and chills the exercise of property rights." *Id.* at 1340 (Larsen, J., concurring) (quoting *Tate*, 432 A.2d at 1391 (Larsen, J., dissenting)).

In the second concurrence, Justice Zappala stated he did not join the reasoning of the OAJC to the extent it approved of and relied on *Tate*. He found *Tate* distinguishable because it involved a statutory defense to defiant trespass, which he found demonstrated the "legislative judgment" "that in some conditions private property interests are not protected by the power of the state to impose criminal penalties." *Id.* at 1340 (Zappala, J., concurring, emphasis omitted). He also questioned the reasoning in *Tate* wherein the Court "assumed that 'lawful conditions' imposed by an owner of private property must necessarily be consistent with the limitations on government action dictated by the First Amendment and Article I, § 7." *Id.* at 1340-41 (Zappala, J., concurring).

In the third concurrence, like the first, Justice McDermott opined that the OAJC should have been limited to holding that private entities that invite the public onto their property for commercial purposes are not "required to allow others to use the land and occasion to express, or solicit for, their world views." *Id.* at 1341 (McDermott, J., concurring).

Finally, Chief Justice Nix concurred in part and dissented in part. He concluded that "the limitation in federal constitutional decisions to matters involving 'state action' is not applicable in an analysis where it is alleged that one of these rights conferred under our [C]onstitution has been violated." *Id.* at 1341 (Nix, C.J., concurring and dissenting). Chief Justice Nix would have balanced the rights at issue, rather than rely on an "implied premise that private ownership must prevail." *Id.* at 1342.

We find that **Tate** is inapplicable here. Under **Tate**, the government cannot impose criminal penalties for entering private property that has been opened for speech and petition activities, where there is a statutory defense for those who comply with the lawful conditions of accessing the property, and the property owner employs a standardless policy to determine who may access the property to exercise speech and petition rights. That holding does not cover the allegations of Appellants' Complaint. The opinions in **Western Pennsylvania II** – highlighting the private nature of the parties there and stressing the criminal charges in **Tate** – show that a majority of the Court (Justices Hutchinson, Flaherty, Larsen, and Zappala) agreed that **Tate** does not extend that far. We affirm the order sustaining the demurer and dismissing the Complaint with prejudice.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 4/3/2025