J-S47041-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVID MORGAN ROTHHAAR | : | |
| | : | |
| Appellant | : | No. 64 EDA 2024 |

Appeal from the Judgment of Sentence Entered November 29, 2023
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0003675-2022

BEFORE: KUNSELMAN, J., SULLIVAN, J., and BECK, J.

CONCURRING AND DISSENTING MEMORANDUM BY BECK, J.:

**FILED OCTOBER 27, 2025**

I agree with the learned Majority that Rothhaar waived his claim that the suppression court impermissibly allowed the Commonwealth to advance a new legal theory in its motion to reconsider. *See* Majority Mem. at 10-12. I depart from the Majority's determination, however, that Rothhaar waived his departure claim, i.e., that Article I, Section 8 of the Pennsylvania Constitution provides greater protection than the Fourth Amendment to the United States Constitution. *See id.* at 12-17. I would address the merits of this claim and conclude that the guarantees of Article I, Section 8 render the attenuation

doctrine as set forth in **Utah v. Strieff**, 579 U.S. 232 (2016),[1] inapplicable in this scenario. Specifically, I would hold that when a police officer makes an unlawful investigatory stop, discovers during the stop that the individual has an outstanding arrest warrant, arrests the individual pursuant to that warrant, and, during a search incident to that arrest, finds incriminating evidence, the attenuation doctrine does not operate as an exception to the exclusionary rule under the Pennsylvania Constitution. Accordingly, I would vacate Rothhaar's judgment of sentence and remand the matter for proceedings consistent with this dissent.[2] My reasoning follows.

### Waiver

The Majority finds Rothhaar waived his constitutional departure claim. Respectfully, my review of the record belies this conclusion. Of relevance to the question of waiver, Rothhaar filed a suppression motion alleging he was detained without reasonable suspicion in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 8 of the Pennsylvania charter. At the time Rothhaar filed his

---

[1] As the Majority recounts, in **Strieff**, the United States Supreme Court held that under the Fourth Amendment, evidence seized by a detective as part of a search incident to Edward Strieff's arrest was admissible because the detective's discovery of an outstanding arrest warrant for Strieff attenuated the connection between the unlawful investigative stop and the seizure of incriminating evidence from him during the search incident to that arrest. **Strieff**, 579 U.S. at 243.

[2] Because I would find Rothhaar's first issue dispositive, I would not reach his second issue relating to the trial testimony of Russell Mitchell.

suppression motion, the Commonwealth had not advanced any defenses thereto, including the applicability of **Strieff** and the attenuation doctrine. **See Commonwealth v. Chase**, 960 A.2d 108, 118 (Pa. 2008) (holding that "an investigative detention under the Fourth Amendment and Article I, § 8 is coterminous") (citation and quotation marks omitted). As such, there was no reason for Rothhaar to raise a departure claim in his motion; he had no obligation to anticipate and counter all potential defenses to the exclusionary rule that could be raised by the Commonwealth.

It was not until after the suppression court ruled in favor of suppression that the Commonwealth, for the first time, raised the attenuation doctrine as a defense in its motion for reconsideration. Rothhaar did not have an obligation to file a written response to the Commonwealth's motion, and the suppression court did not order one.

At the subsequent hearing on the Commonwealth's motion, the record reflects that Rothhaar raised several arguments in opposition to the application of the attenuation doctrine before the suppression court. First, as the Majority acknowledges, **see** Majority Mem. at 5, he argued that **Strieff** did not apply based upon the greater protection afforded by the Pennsylvania Constitution and that **Strieff** had not been adopted in Pennsylvania; alternatively, he asserted that **Strieff** should not apply on the merits, citing federal law in support. **See** N.T., 1/31/2023, at 87-91. Our Supreme Court has held that this is sufficient for preserving a constitutional departure claim.

*See Commonwealth v. Alexander*, 243 A.3d 177, 193 n.8 (Pa. 2020) (holding Alexander "sufficiently preserved" his constitutional departure issue where "[t]he motion to suppress used a pre-printed check box form" challenging a warrantless search and defense counsel argued at the suppression hearing that his motion was "based on [enumerated federal constitutional provisions] and the broader protections of Pennsylvania Constitution, Article One Section Eight").[3]  The Majority faults Rothhaar for failing to conduct an analysis pursuant to *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), before the suppression court, *see* Majority Mem. at 5, 13, 15, but an *Edmunds* analysis is not required to preserve the claim.[4]  *See Alexander*, 243 A.3d at 193 n.8; *see also Armslist LLC v. Facebook, Inc.*,

_____

[3] In my view, the Majority's reliance on *Commonwealth v. Foster*, 332 A.3d 1187 (Pa. 2025) is misplaced.  *See* Majority Mem. at 15-16.  Unlike Foster, Rothhaar raised the claim that our Constitution provides heightened protection at the second hearing before the suppression court and he extensively briefed his reasoning before this Court.  *Compare Foster*, 332 A.3d at 1194 n.9. Further, in finding Foster's departure claim waived, our Supreme Court found it significant that he did not raise such a claim in his petition for allowance of appeal.  *Id.*  In other words, Foster attempted to raise his departure claim for the first time in his brief before our Supreme Court.

[4] The Majority reproaches Rothhaar for citing *Hudson v. Michigan*, 547 U.S. 586 (2006), instead of *Edmunds* and treats his mention of this case at the hearing as the basis for its determination that he conceded Article I, Section 8 does not afford him greater protection than its federal counterpart.  *See* Majority Mem. at 5, 15.  However, there is no record support for any such concession by Rothhaar; the record reflects that Rothhaar cited *Hudson* in support of his alternative argument that *Strieff* should not apply on the merits, noting for the suppression court that *Strieff* cited to *Hudson* as a "famous" attenuation doctrine case.  N.T., 1/31/2023, at 87-88.

- 4 -

335 A.3d 1, 8 n.6 (Pa. Super. 2025) ("[T]he *Edmunds* factors were adopted as a guide and not a talisman, and a litigant's failure to brief each of these factors does not waive a departure claim.") (citations and quotation marks omitted).

The Majority's contention that the suppression court did not decide whether to depart from *Strieff* because of Rothhaar's lack of argument is likewise belied by the record. *See* Majority Mem. at 7, 13-14. The suppression court's decision recognizes that Rothhaar claimed *Strieff* was inapplicable because the Pennsylvania Constitution provides greater protection than its federal counterpart, but it chose to defer that decision to a higher court. Findings of Fact and Conclusions of Law, 5/1/2023, ¶¶ 46, 49 (stating that no Pennsylvania appellate court had yet conducted an *Edmunds* analysis to either accept or reject *Strieff* under Pennsylvania law and concluding that it was "constrained to follow *Strieff* in the absence of any decisions to the contrary by Pennsylvania appellate courts").

Indeed, the reasons for issue preservation—including giving the opposing party a fair opportunity to respond and allowing the court of original jurisdiction to correct its mistakes—are fully met here. *See Schmidt v. Boardman Co.*, 11 A.3d 924, 941 (Pa. 2011); *Commonwealth v. Reeves*, 923 A.2d 1119, 1131 (Pa. 2007). The record reflects that the Commonwealth understood and responded to Rothhaar's departure argument at the hearing, asserting that *Strieff* is applicable under the Pennsylvania Constitution; our

federal and state charters are coextensive with respect to search and seizure law; no Pennsylvania court has determined **Strieff** does not apply; a determination that the Pennsylvania Constitution affords greater protection would require the court to undertake an **Edmunds** analysis; and Pennsylvania case law supports the rationale for the attenuation doctrine as applied in **Strieff**. **See** N.T., 1/31/2023, at 91-94.

The Majority further finds waiver based upon Rothhaar's alleged failure to include the claim in his Rule 1925(b) statement. **See** Majority Mem. at 16-17; **see also** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."). The record reflects, however, that in his Rule 1925(b) statement Rothhaar expressly challenges the suppression court's failure to suppress the evidence discovered as a result of his illegal detention without reasonable suspicion. Rule 1925(b) Statement, 1/19/2024, ¶¶ 2-4. The sole basis for the trial court's denial of suppression was its conclusion that the attenuation doctrine, as articulated in **Strieff**, operated here as an exception to the exclusionary rule. **See** Findings of Fact and Conclusions of Law, 5/1/2023, ¶ I ("While [Rothhaar] was detained without reasonable suspicion, pursuant to the Supreme Court of the United States' ruling in **Utah v. Strieff**, this Court is constrained to rule that the search and seizure of [Rothhaar] and [Rothhaar]'s items will not be suppressed.") (cleaned up; emphasis omitted); **id.**, ¶¶ 46, 49. Further, in its 1925(a) opinion, the suppression court

addressed Rothhaar's claim as to the inapplicability of **Strieff**, continuing to adhere to its belief that in the absence of a Pennsylvania appellate decision or pronouncement by our General Assembly that Pennsylvania law does not follow **Strieff**, it was duty-bound to apply it under the facts of this case:

> **Utah v. Strieff** makes it clear that, pursuant to the United States Constitution, discovery of an arrest warrant can be a sufficient intervening event to break the causal chain between an unlawful stop and any contraband found. Absent any Pennsylvania statues or case law to the contrary, th[e suppression c]ourt was constrained to follow the ruling set forth by the United States Supreme Court. [Rothhaar's] claims that th[e suppression court] erred are wholly without merit.

Suppression Court Opinion, 1/30/2024, at 16-17. Thus, I would conclude that his Rule 1925(b) statement sufficiently preserved this issue for appeal. *See* **Commonwealth v. Arnold**, 284 A.3d 1262, 1269 n.9 (Pa. Super. 2022) (declining to find waiver because the trial court "was well[]aware of the nature and scope of Appellant's constitutional challenge"); *see also* **Commonwealth v. Rogers**, 250 A.3d 1209, 1224 (Pa. 2021) ("the purpose of Rule 1925 is to facilitate appellate review and to provide the parties and the public with the legal basis for a judicial decision") (citations omitted).

Significantly, neither the Commonwealth nor the trial court contend that Rothhaar waived his claim that the federal attenuation doctrine is incompatible with the broader privacy protections guaranteed by Article I, Section 8 of our state charter. Our Supreme Court has disfavored this Court's sua sponte finding of waiver of an appellant's constitutional departure claim where the Commonwealth has not raised waiver. *See Commonwealth v. Wolfel*, 233

A.3d 784, 790 (Pa. 2020); *see also* Sarah Reeves, Comment, *Appellate Waiver in Pennsylvania and Its Effects on Litigants' Rights to Appeal*, 25 U. PA. J. CONST. L. 650, 656, 679-80, 685 (2023) (criticizing this Court for finding litigants' claims waived where neither party has advanced a waiver argument, questioning the appropriateness of an appellate court's sua sponte finding of waiver, and arguing for its elimination).

Simply put, I respectfully disagree that Rothhaar waived this issue of first impression. "A litigant's right to appeal an unfavorable trial court decision is critical to American jurisprudence" as explicitly guaranteed by the Pennsylvania Constitution," *see* PA. CONST. art. V, § 9; "[e]xcessive use of appellate waiver doctrine seriously puts into question Pennsylvania's constitutional promise that litigants will be afforded a right to a meaningful appeal." Reeves, *Appellate Waiver in Pennsylvania and Its Effects on Litigants' Rights to Appeal*, 25 U. PA. J. CONST. L. at 653-54; *see also id.* at 678-79 (noting that "the sheer volume of waivers occurring in Pennsylvania and the number of separate grounds on which the Superior Court is finding claims waived suggests that, in the aggregate, Pennsylvania litigants are not enjoying a meaningful right to appeal"). I therefore proceed to review the merits of this claim.[5]

---

[5] When reviewing the denial of a motion to suppress, this Court is bound by the suppression court's findings of fact that are supported by the record; its legal conclusions, however, are not binding, and this Court reviews those
*(Footnote Continued Next Page)*

**Applicability of *Strieff***

<u>Rothhaar's Argument</u>

Rothhaar argues that the suppression court erred in denying his motion to suppress based on the attenuation doctrine and ***Strieff***. **See** Rothhaar's Brief at 15, 22-37. He contends that the federal attenuation doctrine under the Fourth Amendment is incompatible with the broader privacy protections guaranteed by Article I, Section 8 of our state charter. ***Id.*** He maintains that ***Strieff***'s focus on the nature of the police misconduct in examining whether the attenuation exception applies is very similar to the federal good faith exception to the exclusionary rule, which Pennsylvania-centric jurisprudence has rejected, making it untenable in Pennsylvania. ***Id.*** at 15, 25-28. In so arguing, Rothhaar conducts an analysis of the four factors delineated in ***Edmunds*** and urges this Court to conclude that "[b]ecause the interests provided by Article I, Section 8, of the Pennsylvania Constitution have been repeatedly held to be rooted in the right to privacy, the attenuation doctrine cannot serve to justify the illegal detention of [Rothhaar] under Article I, Section 8, of the Pennsylvania Constitution." ***Id.*** at 26-37.

---

determinations de novo. ***Commonwealth v. McMahon***, 280 A.3d 1069, 1071 (Pa. Super. 2022). "Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted." ***Id.*** (quotation marks and citation omitted). This Court's scope of review is limited to the record created for suppression and excludes evidence admitted at trial. ***Id.***

Exclusionary Rule and Purge of the Taint of the Unlawful Detention

An investigative detention constitutes a seizure of a person and activates the protections of both the Fourth Amendment and Article I, Section 8. *Commonwealth v. Rice*, 304 A.3d 1255, 1261 (Pa. Super. 2023); *Commonwealth v. Smith*, 172 A.3d 26, 32 (Pa. Super. 2017). In general, the exclusionary rule applies to evidence that was obtained from an illegal search or seizure under both the Fourth Amendment and under Article I, Section 8. *See Commonwealth v. Johnson*, 86 A.3d 182, 187 (Pa. 2014) ("The established remedy for illegal seizures and searches, in criminal cases, is exclusion of the fruits of the illegal police conduct—under both the Fourth Amendment and under Article I, Section 8."). "Evidence constitutes fruit of the poisonous tree, and must be suppressed, if it was obtained by exploitation of the illegality and so long as the taint of that illegality has not been purged." *Commonwealth v. Shabezz*, 166 A.3d 278, 290 (Pa. 2017) (quotation marks and citation omitted).

Because the suppression court concluded that police detained Rothhaar without reasonable suspicion, it found Rothhaar's statements to police, his consensual DNA swab while in custody, and the evidence recovered from his backpack were fruits of the poisonous tree.[6] Thus, the issue is whether the

_____

[6] I also respectfully disagree with Judge Sullivan's determination that Rothhaar's interaction with police was a mere encounter or, alternatively, an investigative detention supported by reasonable suspicion. *See* Concurring
*(Footnote Continued Next Page)*

taint of Rothhaar's illegal detention was purged to permit admission of the evidence. **See Shabezz**, 166 A.3d at 290. The suppression court concluded that the evidence at issue was admissible pursuant to the attenuation doctrine and **Strieff**. **See** Findings of Fact and Conclusions of Law, 5/1/2023, ¶¶ 38-49.

The Supreme Court of the United States has recognized a number of exceptions to the exclusionary rule under the Fourth Amendment, three of which "involve the causal relationship between the unconstitutional act and the discovery of evidence": the (1) independent source, (2) inevitable discovery, and (3) attenuation doctrines.[7] **Strieff**, 579 U.S. at 238. "[T]he

---

Mem. at 1-10. Notably, the Commonwealth does not argue in its brief before this Court that the stop was a mere encounter and it conceded in the suppression court that the interaction was an investigative detention. **See** Commonwealth's Brief at 4 n.2. Regardless, I agree with the suppression court that police detained Rothhaar without reasonable suspicion. **See** Findings of Fact and Conclusions of Law, 5/1/2023, ¶ 29.

[7] Our Supreme Court has suggested that these doctrines are not "exceptions" to the exclusionary rule, but rather operate entirely outside of the rule. **See Commonwealth v. Katona**, 240 A.3d 463, 479 n.14 (Pa. 2020) ("The independent source doctrine does not involve an exclusionary rule 'exception,' such as the good faith exception, but a question of taint from prior illegality, which implicates principles of independence and attenuation. It is not an 'exception' to the exclusionary rule to admit untainted evidence; no rational application of an exclusionary rule would exclude untainted evidence.") (quoting **Commonwealth v. Henderson**, 47 A.3d 797, 806 n.2 (Pa. 2012) (Castille, C.J., concurring)). However, the United States Supreme Court, and other decisions by our High Court, have expressly recognized the independent source, inevitable discovery, and attenuation doctrines as "exceptions" to the exclusionary rule. **See Strieff**, 579 U.S. at 238; **see also**, **e.g.**, **Commonwealth v. Santiago**, 209 A.3d 912, 922-23 (Pa. 2019). I therefore likewise utilize that language.

independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Id.* (citing **Murray v. United States**, 487 U.S. 533, 537 (1988)).

> "[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred. … When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation."

**Murray**, 487 U.S. at 537 (quoting **Nix v. Williams**, 467 U.S. 431, 443 (1984)) (emphasis omitted).

Closely related to the independent source doctrine is the inevitable discovery doctrine, which "allows for the admission of evidence that would have been discovered even without the unconstitutional source." **Strieff**, 579 U.S. at 238 (citing **Nix**, 467 U.S. at 443-44). When "the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible." **Nix**, 467 U.S. at 448.

The third such exception, known as the attenuation doctrine, provides that "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the

- 12 -

evidence obtained." ***Strieff***, 579 U.S. at 238 (citing ***Hudson***, 547 U.S. at 593). Beginning with the premise that not all evidence "is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police," the ***Hudson*** Court stated that "the more apt question" is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" ***Hudson***, 547 U.S. at 592 (emphasis omitted) (quoting ***Wong Sun v. United States***, 371 U.S. 471, 487-88 (1963) (citation omitted)). The relevant factors to consider in determining the applicability of the attenuation doctrine include: (1) whether the suspect was provided warnings pursuant to ***Miranda v. Arizona***, 384 U.S. 436 (1966), (2) "the temporal proximity" between the arrest and the unlawful police conduct, (3) "the presence of intervening circumstances," and (4) "the purpose and flagrancy of the official misconduct." ***Brown v. Illinois***, 422 U.S. 590, 603-04 (1975) (citations omitted).[8]

---

[8] The ***Brown*** Court held that ***Miranda*** warnings, standing alone, do not always purge the taint of an illegal arrest. ***Brown***, 422 U.S. at 605. There, police unlawfully arrested Richard Brown in violation of the Fourth Amendment. ***Id.*** at 591. Police provided ***Miranda*** warnings, and thereafter, while in custody, he made two inculpatory statements. ***Id.*** The issue was "whether the statements were to be excluded as the fruit of the illegal arrest, or were admissible because the giving of the ***Miranda*** warnings sufficiently attenuated the taint of the arrest." ***Id.*** at 591-92. The High Court analyzed the above-enumerated factors to conclude that the government failed to
*(Footnote Continued Next Page)*

- 13 -

The Pennsylvania Supreme Court has likewise recognized independent source and inevitable discovery exceptions to the exclusionary rule under Article I, Section 8. Our decisions, however, do not mirror exactly Fourth Amendment jurisprudence because of Article I, Section 8's primary purpose of safeguarding privacy and requiring that warrants be issued only upon probable cause, which differs from the Fourth Amendment's sole purpose of deterring police misconduct. *See*, *e.g.*, *Katona*, 240 A.3d at 473-80 (explaining the history of the independent source doctrine under Pennsylvania law); *Commonwealth v. Berkheimer*, 57 A.3d 171, 181-88 (Pa. Super. 2012) (en banc) (explaining the history of evidence subject to inevitable discovery under the independent source doctrine in Pennsylvania).[9]

Further, our Supreme Court has applied the attenuation doctrine in prior cases. *See*, *e.g.*, *Commonwealth v. Burno*, 154 A.3d 764, 788-89 (Pa.

---

sustain its burden of showing that Brown's statements were admissible. *Id.* at 604-05.

[9] This overlap in caselaw is unavoidable because, as the United States Supreme Court has observed, the two doctrines are intertwined:

> This "inevitable discovery" doctrine obviously assumes the validity of the independent source doctrine as applied to evidence initially acquired unlawfully. … The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.

*Murray*, 487 U.S. at 539 (emphasis omitted).

2017); *Commonwealth v. Smith*, 995 A.2d 1143, 1152-53 (Pa. 2010); *Commonwealth v. Freeman*, 757 A.2d 903, 909 (Pa. 2000); *Commonwealth v. Green*, 581 A.2d 544, 551 (Pa. 1990); *Commonwealth v. McFeely*, 502 A.2d 167, 170-71 (Pa. 1985); *Commonwealth v. Bogan*, 393 A.2d 424 (Pa. 1978) (plurality).  As discussed below, however, every case to which our High Court has applied the attenuation doctrine was decided under the Fourth Amendment to the United States Constitution; none was based on state constitutional grounds.

*Attenuation Doctrine and **Strieff** – Fourth Amendment*

The most recent pronouncement of the attenuation doctrine by the United States Supreme Court occurred in *Strieff*, which arose from factual circumstances very similar to those in the case at bar.  In *Strieff*, a narcotics detective was conducting surveillance of a house based on an anonymous tip of drug activity there.  *Strieff*, 579 U.S. at 235.  He observed frequent visitors who left the house within a few minutes of their arrival, raising his suspicion of drug dealing at the house.  *Id.*  When one of the visitors, Strieff, exited the house and walked toward a nearby convenience store, the detective detained him in the store's parking lot, identified himself, and asked what Strieff was doing at the house.  *Id.*  The detective then asked for Strieff's identification and he complied.  *Id.*  The detective relayed Strieff's information to a police dispatcher, who reported that Strieff had an outstanding arrest warrant.  *Id.*  The detective arrested Strieff pursuant to the warrant, searched him incident

to arrest, and found methamphetamine and drug paraphernalia. *Id.* at 235-36.

After he was charged, Strieff sought suppression of the evidence, arguing that it was derived from an unlawful investigative detention in violation of the Fourth Amendment. *Id.* at 236. At the suppression hearing, the prosecutor conceded that the detective lacked reasonable suspicion for the stop but argued against suppression "because the existence of a valid arrest warrant attenuated the connection between the unlawful stop and the discovery of the contraband." *Id.* The suppression court denied the suppression motion; the Utah appellate court affirmed but the Utah Supreme Court reversed. *Id.*

The United States Supreme Court granted certiorari and reversed. It began by examining whether the attenuation exception to the exclusionary rule "applies when an officer makes an unconstitutional investigatory stop; learns during that stop that the suspect is subject to a valid arrest warrant; and proceeds to arrest the suspect and seize incriminating evidence during a search incident to that arrest." *Id.* at 235. Guided by three of the four attenuation factors set forth in *Brown*,[10] the *Strieff* Court considered "whether the discovery of a valid arrest warrant was a sufficient intervening

_____

[10] As the evidence in *Strieff* did not include statements made by the suspect in response to police questioning, *Miranda* warnings were not necessary, and this factor was not relevant to the Court's consideration.

- 16 -

event to break the causal chain between the unlawful stop and the discovery of drug-related evidence on Strieff's person." *Id.* at 239.

In analyzing the first factor, temporal proximity, the High Court found that it favored suppression because "only minutes" passed between the illegal stop and discovery of the contraband. *Id.* The Court clarified that this factor will weigh in favor of suppression unless "substantial time" has elapsed between the unlawful act and when the evidence is obtained, noting that in *Brown*, an interval of "less than two hours" following his unconstitutional arrest was found to be insufficient. *Id.* at 239-40.

As for the second factor, the presence of intervening circumstances, the High Court found that it "strongly" favored admitting the evidence because the warrant for Strieff's arrest was valid, predated the detective's investigation, and was "entirely unconnected with the stop." *Id.* at 240. The Court explained that the detective's arrest of Strieff was "a ministerial act that was independently compelled by the pre-existing warrant" and, once arrested, the detective could lawfully search Strieff incident to his arrest for safety. *Id.* at 240-41.

Lastly, the *Strieff* Court found that the third factor, the purpose and flagrancy of the official misconduct, also "strongly" favored admissibility. It reasoned that because the purpose of the exclusionary rule under the Fourth Amendment is "to deter police misconduct," this factor "reflects that rationale by favoring exclusion only when the police misconduct is most in need of

- 17 -

deterrence—that is, when it is purposeful or flagrant." *Id.* at 241 (citation omitted). In analyzing the facts pertinent to this consideration, the **Strieff** Court explained:

> [The detective] was at most negligent. In stopping Strieff, [he] made two good-faith mistakes. First, he had not observed what time Strieff entered the suspected drug house, so he did not know how long Strieff had been there. [The detective] thus lacked a sufficient basis to conclude that Strieff was a short-term visitor who may have been consummating a drug transaction. Second, because he lacked confirmation that Strieff was a short-term visitor, [the detective] should have asked Strieff whether he would speak with him, instead of demanding that Strieff do so. [The detective's] stated purpose was to find out what was going on in the house. Nothing prevented him from approaching Strieff simply to ask. **See Florida v. Bostick**, 501 U.S. 429, 434 … (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions"). But these errors in judgment hardly rise to a purposeful or flagrant violation of Strieff's Fourth Amendment rights.

*Id.* (quotation marks, brackets, and some citations omitted).

The High Court continued, remarking that after the initial illegal stop, the detective's conduct was lawful, his decision to run a warrant check was precautionary for officer safety, and Strieff was lawfully searched incident to arrest. *Id.* Further, the **Strieff** majority found it significant that there was "no indication that this unlawful stop was part of any systemic or recurrent police misconduct," but rather the evidence suggested that "the stop was an isolated instance of negligence that occurred in connection with a bona fide investigation of suspected a drug house." *Id.* at 242. The Court concomitantly rejected Strieff's arguments that (1) the detective stopped him solely to fish for evidence of suspected wrongdoing; (2) the detective's

- 18 -

misconduct was flagrant because he detained Strieff without the necessary level of cause; and (3) because of the prevalence of outstanding arrest warrants, police would engage in dragnet searches if the exclusionary rule was not applied. *Id.* at 242-43. In holding that the evidence was admissible because discovery of the arrest warrant sufficiently attenuated the unlawful stop, the Court in *Strieff* placed added emphasis on the third factor, stating that it was "especially significant that there [was] no evidence that [the detective's] stop reflected flagrantly unlawful police misconduct." *Id.*

*Attenuation Doctrine – Article I, Section 8*

As noted above, and discussed in detail below, the Pennsylvania Supreme Court has applied the attenuation doctrine in prior cases, but not in matters similar to the facts and circumstances present in this case and never in matters decided under Article I, Section 8 of the Pennsylvania Constitution. To the contrary, an appellate court in Pennsylvania has yet to decide this question.[11] Examining this issue of first impression, I am cognizant that our Supreme Court "has long emphasized that, in interpreting a provision of the Pennsylvania Constitution, we are not bound by the decisions of the United States Supreme Court which interpret similar (yet distinct) federal constitutional provisions." *Edmunds*, 586 A.2d at 894 (citations omitted).

___

[11] Indeed, the suppression court recognized that no Pennsylvania appellate court has "expressly accepted nor rejected the ruling in *Strieff*." Findings of Fact and Conclusions of Law, 5/1/2023, ¶ 46.

Instead, "the federal constitution establishes certain minimum levels which are equally applicable to the analogous state constitutional provision. However, each state has the power to provide broader standards, and go beyond the minimum floor which is established by the federal Constitution." *Id.* (quotation marks, brackets, and citations omitted). "Although we may accord weight to federal decisions where they are found to be logically persuasive and well reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, we are free to reject the conclusions of the United States Supreme Court so long as we remain faithful to the minimum guarantees established by the United States Constitution." *Id.* at 895 (quotation marks and citations omitted); *see also Wolfel*, 233 A.3d at 789-90 ("The Fourth Amendment rulings of the Supreme Court of the United States … establish the baseline for the protections afforded by Article I, Section 8 of the Pennsylvania Constitution.") (citation omitted).

### *Edmunds* Analysis

In determining whether the attenuation doctrine as set forth in *Strieff* is compatible with Article I, Section 8, an independent analysis of that provision, as guided by our Supreme Court's seminal decision in *Edmunds*, is required. Under *Edmunds*, consideration of our state's constitutional doctrine includes an examination of the following four factors: (1) the "text of the Pennsylvania constitutional provision"; (2) the "history of the provision, including Pennsylvania case-law"; (3) "related case-law from other states";

and (4) "policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." *Edmunds*, 586 A.2d at 895.[12]

### 1. Text

The text of Article I, Section 8 of the Pennsylvania Constitution provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST. art. I, § 8. The Fourth Amendment to the United States Constitution states:

---

[12] *Edmunds* involved the applicability under the Pennsylvania Constitution of the federal "good faith" exception to the warrant requirement. Louis Edmunds was convicted of drug-related charges, after the denial of suppression of marijuana seized at his property and his statements to police pursuant to a search warrant. *Id.* at 888-90. The search warrant was later determined to be defective as unsupported by probable cause. *Id.* The Commonwealth argued that Pennsylvania should adopt the good faith exception to the exclusionary rule set forth in *United States v. Leon*, 468 U.S. 897 (1984), in which the United States Supreme Court held "the Fourth Amendment does not mandate suppression of illegally seized evidence obtained pursuant to a constitutionally defective warrant, so long as the police officer acted in good faith reliance upon the warrant issued by a neutral and detached magistrate." *Edmunds*, 586 A.2d at 888, 892.

After examining the aforementioned factors (now generally known as an "*Edmunds* analysis"), our Supreme Court rejected *Leon* under Article I, Section 8, holding it "does not incorporate a 'good faith' exception to the exclusionary rule" and such an exception would "frustrate the guarantees embodied" in Article I, Section 8. *Id.* at 888, 905-06.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. As our Supreme Court observed in **Edmunds**, "the wording of the Pennsylvania Constitution is similar in language to the Fourth Amendment of the United States Constitution, but our courts "are not bound to interpret the two provisions as if they were mirror images, even where the text is similar or identical." **Edmunds**, 586 A.2d at 895-96 (footnotes and citation omitted).

Our Supreme Court has regularly departed from the United States Supreme Court's construction of the Fourth Amendment, holding Article I, Section 8 "generally provides greater protection than that provided by the Fourth Amendment, because the core of its exclusionary rule is grounded in the protection of privacy while the federal exclusionary rule is grounded in deterring police misconduct." **Commonwealth v. Brown**, 996 A.2d 473, 476 (Pa. 2010) (quotation marks and citation omitted). Accordingly, I proceed to the second prong of **Edmunds**.

## 2. History and Pennsylvania Case Law

### a. Protection under Article I, Section 8

The **Edmunds** Court recognized "the unique history" of Article I, Section 8, noting that "constitutional protection against unreasonable searches and seizures existed in Pennsylvania more than a decade before the adoption of

the federal Constitution, and fifteen years prior to the promulgation of the Fourth Amendment." ***Edmunds***, 586 A.2d at 896 (quotation marks and citation omitted). Observing that our Supreme Court has repeatedly recognized that Article I, Section 8 "is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries," the ***Edmunds*** Court concluded that its history "indicates that the purpose underlying the exclusionary rule in this Commonwealth is quite distinct from the purpose underlying the exclusionary rule under the 4th Amendment." ***Id.*** at 897.

Our High Court explained that "the **sole** purpose for the exclusionary rule under the [Fourth] Amendment [is] to deter police misconduct" and that the federal exclusionary rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." ***Id.*** (emphasis in original; quotation marks and citations omitted); ***see also Alexander***, 243 A.3d at 203 ("[P]romoting effective law enforcement is the driving force explaining the United States Supreme Court's applications of the exclusionary rule.") (citing ***Herring v. U.S.***, 555 U.S. 135, 147-48 (2009)).

In contrast, our Supreme Court has "forge[d] its own path" and repeatedly made clear in "a steady line of case[]law" that Article I, Section 8 of the Pennsylvania Constitution is "unshakably linked to a right of privacy in this Commonwealth." ***Edmunds***, 586 A.2d at 898 (collecting cases). As our

High Court remarked in **Commonwealth v. Sell**, our constitutional provision

demonstrates a paramount concern for privacy:

> In construing Article I, section 8, we find it highly significant that the language employed in that provision does not vary in any significant respect from the words of its counterpart in our first constitution. The text of Article I, section 8 thus provides no basis for the conclusion that the philosophy and purpose it embodies today differs from those which first prompted the Commonwealth to guarantee protection from unreasonable governmental intrusion. Rather, the survival of the language now employed in Article I, section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth.

**Commonwealth v. Sell**, 470 A.2d 457, 467 (Pa. 1983). **Edmunds**

emphasized that Article I, Section 8 guards individual privacy rights "more

zealously" than its federal counterpart "by serving as an independent source

of supplemental rights." **Edmunds**, 586 A.2d at 899 (quotation marks and

citation omitted).

> [G]iven the strong right of privacy which inheres in Article I, Section 8, as well as the clear prohibition against the issuance of warrants without probable cause, or based upon defective warrants, the good faith exception to the exclusionary rule would directly clash with those rights of citizens as developed in our Commonwealth over the past 200 years. To allow the judicial branch to participate, directly or indirectly, in the use of the fruits of illegal searches would only serve to undermine the integrity of the judiciary in this Commonwealth. From the perspective of the citizen whose rights are at stake, an invasion of privacy, in good faith or bad, is equally as intrusive. This is true whether it occurs through the actions of the legislative, executive or the judicial branch of government.

**Id.** at 901 (internal citations omitted). Accordingly, our High Court concluded

that "the exclusionary rule in Pennsylvania has consistently served to bolster

the twin aims of Article I, Section 8; to-wit, the safeguarding of privacy and the fundamental requirement that warrants shall only be issued upon probable cause," and thus held that the exclusionary rule applies even where police rely in good faith on a defective warrant. *Id.* at 899 (citations omitted).

As legions of cases from our Supreme Court have continued to artfully detail after *Edmunds*, Article I, Section 8 provides greater protection against unreasonable searches and seizures than does the Fourth Amendment. *See*, *e.g.*, *Wolfel*, 233 A.3d at 790 (stating that the "material distinctions in the application of the respective federal and state charters, the relevant, controlling difference—i.e., the expanded application of the state exclusionary rule—is now apparent and manifest"); *Alexander*, 243 A.3d at 181 (rejecting the federal automobile exception, holding that Article I, Section 8 affords greater protection to the citizens of our Commonwealth than the Fourth Amendment, and reaffirming its prior decisions that Article I, Section 8 requires both a showing of probable cause and exigent circumstances to justify a warrantless search of an automobile); *Commonwealth v. Arter*, 151 A.3d 149, 151 (Pa. 2016) (departing from the federal approach under the Fourth Amendment, and holding that under the greater privacy protections of Article I, Section 8, illegally-obtained evidence suppressed during criminal proceedings is likewise excluded during parole and probation revocation proceedings); *Commonwealth v. McCree*, 924 A.2d 621, 626-27 (Pa. 2007) (recognizing that as compared to federal courts, Pennsylvania courts "have

given greater weight to an individual's privacy interests when balancing the importance of privacy against the needs of law enforcement") (citations omitted); *Commonwealth v. Mason*, 637 A.2d 251, 257 n.3 (Pa. 1993) ("The ultimate distinction, then, between the federal and the Pennsylvania analysis is not that the federal courts seek only to deter police misconduct and the Pennsylvania courts seek to protect certain rights, but that the federal courts place less importance than do we on the right of privacy.").

b. Pennsylvania Cases Applying the Attenuation Doctrine

As the Commonwealth correctly recognizes in its brief before this Court, our Supreme Court has analyzed the factors set forth in *Brown* (and relied upon in *Strieff*) to apply the attenuation doctrine as an exception to the exclusionary rule. *See* Commonwealth's Brief at 22-23. My research reveals, however, that application of the attenuation doctrine by Pennsylvania's appellate courts has been limited to cases decided under the Fourth Amendment to the United States Constitution. *See, e.g.*, *Burno*, 154 A.3d at 788-89; *Smith*, 995 A.2d at 1152-53; *Freeman*, 757 A.2d at 909;[13] *Green*, 581 A.2d at 551; *McFeely*, 502 A.2d at 170-71; *Commonwealth v. Harris*, 421 A.2d 199, 202 (Pa. 1980); *Bogan*, 393 A.2d at 427-28

_____

[13] Freeman argued that Article I, Section 8 afforded her greater protection than the Fourth Amendment, but given its disposition that her consent to search her car should have been suppressed under the Fourth Amendment, our Supreme Court did not address the argument. *Freeman*, 757 A.2d at 906 n.3.

(plurality).[14] These cases do not require this Court to conclude that the attenuation doctrine is therefore applicable under the Pennsylvania Constitution in the circumstances presently before us. *See Commonwealth v. Morley*, 681 A.2d 1254, 1257 (Pa. 1996) (recognizing that a Pennsylvania Supreme Court decision premised on the Fifth Amendment to the United

---

[14] In *Commonwealth v. Farley*, 364 A.2d 299 (Pa. 1976), our Supreme Court made a passing reference in a string of citations to Article I, Section 8 in its acknowledgment of the attenuation doctrine. *See id.* at 302. However, there was no additional discussion of Article I, Section 8 in the decision, and every case cited for both the attenuation doctrine and its holding was decided on Fourth Amendment grounds. *See id.* at 302-04.

Additionally, the *Farley* decision and the cases upon which it relied stated only a two-factor test for application of the attenuation doctrine:

> (a) the proximity of an initial illegal custodial act to the procurement of the confession; and

> (b) the intervention of other circumstances subsequent to an illegal arrest which provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, that illegal arrest.

*Id.* at 303-04 (quoting *In re Betrand*, 303 A.2d 486, 490 (Pa. 1973)). *In re Betrand*, in turn, adopted this statement of the law from a decision of the Third Circuit Court of Appeals. *See In re Betrand*, 303 A.2d at 490 (quoting *Commonwealth ex rel. Craig v. Maroney*, 348 F.2d 22, 29 (3d Cir. 1965)). This was a common statement of the attenuation doctrine prior to *Brown*, based upon the United States Supreme Court's decision in *Wong Sun v. United States* (discussed infra), which did not address the flagrancy (or lack thereof) of the alleged police misconduct in finding that the confession given was sufficiently attenuated from the illegal arrest to allow its admission at trial. *See id.*; *Craig*, 348 F.2d at 29 (both citing *Wong Sun*, 371 U.S. at 491); *see also*, *e.g.*, *Commonwealth v. Bishop*, 228 A.2d 661, 665-66 & n.7 (Pa. 1967) (same).

States Constitution that did not reference Article I, Section 9 of the Pennsylvania Constitution is not binding as it relates to state constitutional concerns).

To the contrary, statements made by members of our Supreme Court suggest the opposite result is required. In **Smith**, for example, a majority of our High Court found, weighing the **Brown** factors, that a confession to murder obtained after executing what police believed to be an outstanding warrant for an unrelated sexual assault (but was, in fact, invalid) was admissible in court under the Fourth Amendment and the attenuation doctrine.[15] **Smith**, 995 A.2d at 1152. The **Smith** Court concluded that although the initial arrest was illegal, he received **Miranda** warnings multiple times; "only a few hours elapsed" between his arrest and confession; police

---

[15] **Smith** involved a claim of ineffective assistance of counsel in failing to move to suppress a confession as the fruit of an illegal arrest. **Smith**, 995 A.2d at 1151. Police executed a search warrant at Wayne Smith's home relating to a murder investigation. **Id.** While there, police arrested Smith on what they believed to be an outstanding warrant for an unrelated sexual assault; they were unaware that the arrest warrant had already been served and the charge dismissed because the warrant had been mistakenly left in an active warrant bin. **Id.** While in custody, Smith waived his **Miranda** rights and told police that he met the murder victim on the evening of the murder but that they later parted ways. **Id.** When police informed Smith that they had information to the contrary, he invoked his right to remain silent and requested counsel. **Id.** Police kept Smith in custody based on the assault warrant, but it was not until the next day that police learned that warrant was invalid. **Id.** at 1151-52. Four hours after so learning, police arrested Smith a second time—this time on the murder charge. **Id.** at 1152. Smith then indicated to a detective that he was willing to waive his **Miranda** rights and gave a tape-recorded confession admitting to the murder. **Id.** at 1152.

stopped their interrogation as soon as he requested counsel; his "offer to talk to police was not elicited by police conduct"; and police "mistakenly believed the warrant was still outstanding" based on an "administrative error." *Id.* at 1152-53.

Justice Saylor filed a concurring and dissenting opinion, agreeing that Smith's confession was admissible under *Brown*, but expressing doubt as to the applicability of that test under our state charter:

> In light of prevailing precedent, I support the majority's application of the attenuation doctrine as consistent with the United States Supreme Court's decision in *Brown* []. As a matter of pure logic, however, it seems to me that the *Brown* factors should apply differently in Pennsylvania than in the federal forum, since the circumstances are to be considered "in light of the policy to be served by the exclusionary rule," *Brown*, 422 U.S. at 604, … and [the Pennsylvania Supreme] Court at least previously has maintained that the policies underlying the exclusionary rule are substantially broader under Pennsylvania jurisprudence than under federal Fourth Amendment law. *Compare* [] *Edmunds*, [586 A.2d at 899]) ("[T]he exclusionary rule in Pennsylvania has consistently served to bolster the twin aims of Article I, Section 8; to-wit, the safeguarding of privacy and the fundamental requirement that warrants shall only be issued upon probable cause."), *with* [] *Leon*, [468 U.S. at 916] (explaining that the federal exclusionary rule serves solely a deterrent purpose). Moreover, it seems somewhat artificial to say that the causal chain between an illegal arrest and an ensuing subsequent confession is "broken" and the taint "purged," where the defendant remains subject to the illegal detention, and in the absence of intervening circumstances beyond the mere giving of *Miranda* warnings. Certainly those knowledgeable in fields of human thinking and behavior may hold a very different view of the impact of an ongoing illegal detention on arrestee behavior.
>
> Nevertheless, the United States Supreme Court has established the prevailing test and put the matter largely into the hands of a fact-finder, subject to deferential appellate review, and th[e Pennsylvania Supreme] Court previously has followed this

direction in [] *McFeely*, [502 A.2d 167], as the majority aptly develops. Left to my own devices, however, I would prefer a more open acknowledgment of the growing unwillingness at the federal and state levels to apply the exclusionary rule in the absence of intentional or, at least grossly negligent, police conduct.

*Smith*, 995 A.2d at 1175 (Saylor, J., concurring and dissenting) (footnotes omitted).

Additionally, Justice Baer filed a concurring opinion, joining the *Smith* majority but writing, in part, to express his view that the High Court must "zealously guard the exclusionary rule to protect against the erosion of one of our society's most cherished of freedoms – the right to be free from unreasonable searches and seizures." *Id.* at 1174 (Baer, J., concurring). He emphasized that *Smith* should not be viewed "as restricting the application of the exclusionary rule" and that he was "opposed to any erosion of the use of this invaluable remedial tool, when appropriate, to preserve our citizens' right to be free from coercive state interference into their lives and affairs." *Id.*

In *Johnson*, the Commonwealth advocated for the applicability of *Smith* and the attenuation doctrine to a case brought under Article I, Section 8 involving police reliance on an expired arrest warrant reasonably and in good faith believed to be valid, contending that the evidence obtained as a result of the arrest should not be suppressed. *Johnson*, 86 A.3d at 185-86. Our

Supreme Court disagreed, concluding that *Edmunds*, not *Smith*, controlled

the outcome. *Id.* at 187.[16]

Noteworthy for my purposes here, the *Johnson* Court expressly

recognized that *Smith* was decided "exclusively under federal law," *id.* at 190,

and that its holding had no applicability to the circumstances before it:

> The attenuation and voluntariness questions at issue in *Smith*, posing questions involving the application of federal law, simply are not involved here. Instead, in this case, we must determine whether the officer's "good faith" belief that he was arresting appellee on a valid warrant defeats the application of the exclusionary remedy recognized by *Edmunds*, interpreting the Pennsylvania Constitution. *Smith* does not remotely support, much less command, recognition of a good faith exception under the existing Article I, Section 8 construct.

*Id.* at 191.

Further, in reaffirming its decision in *Edmunds*, the *Johnson* Court

stressed that whether the mistake was made in good or bad faith was

_____

[16] *Johnson* involved a state trooper who conducted a vehicle stop based on a radio communication about its possible involvement in a drug transaction. *Id.* at 184. Richard Allen Johnson was a passenger in the vehicle; when the trooper ran his name through his patrol car computer, it informed him of an active arrest warrant for Johnson. *Id.* The trooper arrested him and, during a search incident to arrest, discovered heroin, cell phones, and cash on his person. *Id.* While in custody and after receiving *Miranda* warnings, Johnson admitted that he was a drug dealer. *Id.* Thereafter, the trooper learned that he had been erroneously informed of Johnson's arrest warrant; Johnson had actually been served with the warrant nine days earlier and it was no longer valid. *Id.* Even so, police charged him with drug-related crimes. *Id.* The trial court granted his motion to suppress the contraband found during the search incident to arrest and his incriminating statements under Article I, Section 8, analyzing his claim under the *Brown* factors, and ultimately finding suppression was warranted because there is no good faith exception to Pennsylvania's warrant requirement. *Id.* at 184-85.

immaterial to the constitutional analysis because *Edmunds* "turned on a determination that, under Article I, Section 8, the exclusionary rule in Pennsylvania serves other values besides deterrence; it also vindicates an individual's right to privacy." *Id.* at 188. It reiterated what it had stated in *Edmunds*: "From the perspective of the citizen whose rights are at stake, an invasion of privacy, in good faith or bad, is equally as intrusive. This is true whether it occurs through actions of the legislative, executive or the judicial branch of government." *Id.* at 189 (quoting *Edmunds*, 586 A.2d at 901).

### c. Other Relevant Pennsylvania Precedent

The facts underlying the instant matter also harken to Pennsylvania case law that prohibits police from providing retroactive justification for their unconstitutional actions. In *Berkheimer*, for example, an en banc panel of this Court rejected the Commonwealth's attempt to excuse an illegal search by invoking the inevitable discovery doctrine, finding its use "inconsistent with our Supreme Court's jurisprudence and violative of the right to privacy espoused in Article I, Section 8 of Pennsylvania's Constitution." *Berkheimer*, 57 A.3d at 181. Police conducted an unlawful warrantless entry into a residence in the absence of exigent circumstances, but later obtained a search warrant premised, in part, on what police observed in plain view when they unlawfully entered the premises. After recognizing the distinct purposes of Article I, Section 8 to safeguard privacy and require warrants only be issued

upon probable cause, as compared to the deterrence purpose of the Fourth Amendment, this Court stated:

> [U]nlike the exclusionary rule in federal jurisprudence, exclusion of evidence in Pennsylvania does guarantee the substantive rights of our citizens, including the right not to be disturbed in their homes prior to issuance of a warrant upon a good showing of probable cause.
>
> These guarantees and the role of the exclusionary rule in effecting them as a guarantee of substantive rights, delimits the inevitable discovery exception as a remedy for violations of the warrant requirement under Article I, Section 8. The resulting limitation is significantly more restrictive than its counterpart under federal law. In view of the divergent purpose of Article I, Section 8, and the distinct protections conferred by our state constitution, our circumspection in application of the inevitable discovery rule is imperative lest the privacy right enshrined there be swallowed whole by an exception conceived without heed of its existence.

*Id.* at 182 (citing *Edmunds*, 586 A.2d at 895, 899).

Further, in *Commonwealth v. Perel*, this Court refused to apply the inevitable discovery doctrine to an unconstitutional search of the defendant's shaving kit and luggage inside his girlfriend's apartment. *Commonwealth v. Perel*, 107 A.3d 185, 197 (Pa. Super. 2014).

> To hold that courts simply may make a post-hoc determination that sufficient probable cause existed at the time of an otherwise illegal search would be to eliminate the key safeguard that delineates the dignity of the individual living in a free society. Such an approach patently is at odds with the strong notions of privacy that are carefully safeguarded by Article I, Section 8 of the Pennsylvania Constitution.
>
> Stated simply, the inevitable discovery doctrine is not a substitute for the warrant requirement.

*Id.* at 196 (quotation marks and brackets omitted) (citing ***Edmunds***, 586 A.2d at 899); ***see also***, ***e.g.***, ***Commonwealth v. Mackey***, 177 A.3d 221, 228 (Pa. Super. 2017) (stating that "information developed **after** a police-citizen encounter moves from consensual to coercive cannot be used to justify the detention") (emphasis in original; citations omitted); ***Commonwealth v. Arnold***, 932 A.2d 143, 144, 149 (Pa. Super. 2007) (concluding that police could not retroactively justify the search of a casual visitor to an apartment based upon a claim that the visitor lacked a reasonable expectation of privacy in the apartment where police had unlawfully entered the apartment in the first instance; to conclude otherwise would permit officers to "randomly invade homes on the pretense that any person found to be a non-resident after the fact could be searched" and "would trivialize the protections afforded by the United States and Pennsylvania Constitutions") (citing ***Commonwealth v. Demshock***, 854 A.2d 553, 556-57 (Pa. Super. 2004) (finding police must articulate exigent circumstances at time of warrantless entry and cannot provide retroactive justifications to demonstrate exigent circumstances)); ***Commonwealth v. Davis***, 743 A.2d 952, 953 (Pa. Super. 1999) (reiterating that allowing police to observe illegal activities by their own unlawful means "emasculates the protections afforded to appellant and all citizens by the United States and Pennsylvania Constitutions")).

Though not decided under the attenuation doctrine, the above case law of our Commonwealth has consistently held that under Pennsylvania law,

police generally cannot retroactively justify evidence discovered as the result of constitutionally infirm police conduct.[17]

Separately, I observe that over the course of approximately the last decade, our Supreme Court has included the egregiousness of the officer's misconduct as a consideration in its application of the independent source doctrine. In **Henderson**, a majority of the Court shied away from its prior "true independence" requirement for the doctrine to apply. **Henderson**, 47 A.3d at 804. Relying heavily on the factual circumstances of the case before it—that a second search warrant for DNA evidence was obtained following a

---

[17] Additionally, I observe that this Court has suppressed evidence under factual circumstances similar to those present in this case, albeit not expressly under Article I, Section 8 nor with reference to the attenuation doctrine. **See Commonwealth v. Peterson**, 17 A.3d 935, 938-39 (Pa. Super. 2011) (concluding that evidence must be suppressed where "there was no intervening point" between an officer's stop of the defendant without reasonable suspicion and order to provide name, the discovery of an outstanding warrant, the defendant's arrest pursuant to that warrant, the search incident to that arrest, and the discovery of marijuana in a plastic baggie); **Commonwealth v. Hudson**, 995 A.2d 1253, 1259 (Pa. Super. 2010) (holding that the trial court erred in failing to suppress evidence where officer stopped the defendant without reasonable suspicion, asked for identification, discovered an outstanding warrant for the defendant, arrested him pursuant to that warrant, searched him incident to that arrest, and recovered drugs and a large amount of cash on his person); **Commonwealth v. Guillespie**, 745 A.2d 654, 662 n.5 (Pa. Super. 2000) (concluding that evidence seized during a search incident to arrest should have been suppressed because, where police officers lacked reasonable suspicion to detain the defendant to run a warrants check, "the fact of his outstanding warrants would not have come to light and there would have been no independent basis for his arrest and inevitable discovery of the contraband in his search incident to such arrest had the officers acted properly").

second investigation by a separate team from the same police department as the first that obtained the defective warrant—the **Henderson** Court held:

> In the present circumstances, we are unwilling to enforce a "true independence" rule in the absence of police misconduct and on pain of the Commonwealth being forever barred from obtaining non-evanescent evidence connecting Appellant with his crimes. In answer to the specific question presented, we hold that suppression is not required on account of Detective Evans' status as a member of the same police department as Detective Johnson. Rather, in light of the factual circumstances before the Court in both [**Commonwealth v.**] **Melendez**[, 676 A.2d 226 (Pa. 1996),] and **Mason**, we deem it appropriate to limit the independent police team requirement to situations in which the rule prevents police from exploiting the fruits of their own willful misconduct.[FN]
>
> > [FN] **See Mason**, … 637 A.2d at 257 ("[W]here police seize evidence in the absence of a warrant or exigent circumstances by forcibly entering a dwelling place, their act constitutes a violation of Article I, Section 8 of the Pennsylvania Constitution and items seized pursuant to their illegal conduct may not be introduced into evidence[.]"); **Melendez**, … 676 A.2d at 231 ("The Pennsylvania Constitution does not allow police intrusions exemplified by this case and **Mason**. Government agents may not enter private dwellings through the use of battering rams as in **Mason**, or by effecting illegal stops and seizures as in this case, and secure the premises by detaining those who occupy the premises while police wait to learn whether their application for a warrant has been approved.").

**Henderson**, 47 A.3d at 804-05 (footnote in original). In so holding, the Court observed that this approach still differentiates Pennsylvania search and seizure jurisprudence from its federal counterpart, as under the Fourth Amendment, **Leon**'s good faith exception—rejected in **Edmunds**—would have operated to allow the admission of the first DNA sample. **Id.** at 805.

Subsequently, in **Katona**, the Court's majority held that information relayed to police in person by a confidential informant ("the CI") was independent of potentially unlawfully obtained recordings of conversations between the CI and the appellant, where only the former content was used to obtain a search warrant. **See Katona**, 240 A.3d at 482-83. Relying on **Henderson**, the Court stated that the police misconduct at issue was "not remotely within striking distance of the egregious misconduct at issue in **Mason** and **Melendez**," applying instead the federal test for application of the independent source doctrine. **Id.** at 480-81; **see also Murray**, 487 U.S. at 542 (identifying the pertinent considerations in discerning "whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence" to include (1) whether the decision to obtain the warrant was prompted by what police saw during the initial, unlawful entry and (2) whether "information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant"). It further found, pursuant to **Edmunds**, that "when stripped of all references to the allegedly improper recordings," there was ample probable cause to support the issuance of the warrant. **Id.** at 483.

Notably, the Court in both **Katona** and **Henderson** stressed the importance of considering cases on their facts, signaling its abhorrence to prophylactic per se rules, finding experience dictates that generally, "they cannot be sustained on their original terms." **Katona**, 240 A.3d at 474;

***Henderson***, 47 A.3d at 803. Our High Court further recognized that the police, in possession of evidence or information lawfully obtained, should not be placed at a disadvantage simply because the evidence was also previously and separately unlawfully obtained. ***See Katona***, 240 A.3d at 485 ("It is one thing to say that officers shall gain no advantage from violating the individual's rights; it is quite another to declare that such a violation shall put him beyond the law's reach even if his guilt can be proved by evidence that has been lawfully obtained.") (citation and quotation marks omitted).

### 3. Case Law from Other States

A number of states have applied the ***Strieff*** attenuation framework without any independent analysis under their state constitutions or to factual circumstances involving independent acts of the defendant. ***See***, ***e.g.***, ***Massey v. State***, 667 S.W.3d 784, 791, 793-94 (Tex. Crim. App. 2023) (Yeary, J., Opinion Announcing the Judgment of the Court) (stating ***Strieff*** attenuation doctrine applied under the Fourth Amendment where Massey's commission of new, different offenses (resisting search and evading detention) after police conducted an illegal pat-down search of him, which yielded drugs, was an intervening circumstance); ***Barney v. State***, 507 P.3d 459, 464-66 (Wyo. 2022) (holding ***Strieff*** attenuation applied under the Fourth Amendment where, even if police committed constitutional violations during a traffic stop, Barney's flight in his car from the scene and commission of new, distinct crimes broke the causal connection between the alleged police

misconduct and discovery of drugs after he crashed his car); ***State v. Mousseaux***, 945 N.W.2d 548, 554-55 (S.D. 2020) (noting that Mousseaux did not argue the state constitution provided greater protection than the Fourth Amendment and holding the federal attenuation doctrine under ***Strieff*** applied where, assuming Mousseaux's detention lacked reasonable suspicion, police discovered she had an outstanding arrest warrant, arrested and searched her incident to arrest, and found drugs); ***State v. Tatro***, 445 P.3d 173, 180 (Kan. 2019) (finding the court had to follow ***Strieff*** because the defendant only raised a claim under the Fourth Amendment and made no argument as to why a different rule would apply under the Kansas Constitution); ***State v. Edwards***, 452 P.3d 413, 414-15 (N.M. Ct. App. 2019) (noting that Edwards did not argue the state constitution provided greater protection than the Fourth Amendment and applying ***Strieff*** to conclude that a "preexisting, independent, valid arrest warrant was an intervening cause that attenuated any otherwise unlawful seizure of [Edwards] or evidence from his person during a search incident to arrest"); ***Sizer v. State***, 174 A.3d 326, 340-42 (Md. 2017) (applying ***Strieff*** to hold solely under the Fourth Amendment that, assuming investigatory stop of defendant was unlawful, the evidence recovered would be admissible where the discovery of a valid pre-existing arrest warrant attenuated the connection between the stop and evidence seized during the search incident to defendant's arrest).

Notably, the Supreme Court of Kansas distinguished **Strieff** and suppressed evidence that was found during a search incident to arrest despite finding that the Kansas Constitution provided the same protection from unlawful government intrusion as does the Fourth Amendment. In **State v. Ellis**, the Kansas Supreme Court was confronted with circumstances involving a legitimate welfare stop initiated by police that transformed into an unlawful detention, during which police discovered an outstanding warrant and arrested the defendant. **State v. Ellis**, 469 P.3d 65, 74-77 (Kan. 2020). In analyzing the second **Strieff** factor, intervening circumstances, the **Ellis** Court remarked:

> Under the State's theory, police could approach random people on the street, demand their identification cards, and run warrant checks on them. If no warrant came up, then the detainee would be released—no harm, no foul. If a warrant came up, then the warrant would attenuate the unconstitutional stop and justify arrests and searches incident thereto. The police could routinely carry out criminal investigatory detentions of all citizens without risking suppression of discovered evidence.

**Id.** at 75.

Additionally, one state court has declined to follow **Strieff** based on the greater protections afforded by its state constitution than the Fourth Amendment. In **State v. Mayfield**, the Washington Supreme Court rejected the federal attenuation doctrine and applied a more limited version to cases where "an unforeseeable intervening act genuinely severs the causal connection between official misconduct and the discovery of evidence." **State v. Mayfield**, 434 P.3d 58, 74 (Wash. 2019). In reaching its decision, the

*Mayfield* Court determined that application of the federal attenuation doctrine in *Strieff* "clearly conflicts with [its] state exclusionary rule by admitting illegally seized evidence and allowing the State to benefit from the unconstitutional actions of its officers." *Id.* at 72 (citation omitted). It explained that unlike the Fourth Amendment, "the primary purpose of Washington's exclusionary rule is **not** to deter official misconduct under threat of suppression. Deterrence is a benefit of our state exclusionary rule, but its primary purpose is to protect the individual right to privacy and to provide a certain remedy when that right is violated." *Id.* (emphasis in original).

The Washington Supreme Court explicitly stated that its adoption of a narrow attenuation doctrine "is entirely independent of the modern attenuation doctrine used by the federal courts" and as such,

> it is irrelevant to our state attenuation doctrine whether suppression in one case will deter similar misconduct in the future. It is also irrelevant whether the officer's misconduct was merely negligent or was instead flagrant and purposeful. The only question is whether unforeseeable intervening actions genuinely severed the causal connection between official misconduct and the discovery of evidence. If not, then the attenuation doctrine does not apply, and the evidence must be excluded in accordance with article I, section 7[18] and our state exclusionary rule.

*Id.* at 74.

---

[18] Article I, Section 7 of the Washington Constitution states: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, § 7.

The case involved an officer's illegal seizure of Mayfield across the street from his parked truck and requested consent to search his person and truck; the search uncovered bundled cash and drugs. *Id.* at 74. Applying its narrow state attenuation doctrine, the Washington Supreme Court found there were no intervening circumstances sufficient to satisfy the doctrine. *Id.* at 63, 74-76. It examined how the federal attenuation doctrine has expanded from a limited exception requiring a superseding cause to a broad exception focused on deterring official misconduct. *Id.* at 71-72. The Washington Supreme Court explained that the "attenuation doctrine originally served the same function in the context of the exclusionary rule that the superseding cause doctrine serves in the context of tort law." *Id.* at 71. Citing Justice Kagan's dissent in *Strieff*, it elucidated:

> Where unforeseeable intervening circumstances genuinely severed the chain of causation between official misconduct and the discovery of evidence, the intervening circumstances operated as a superseding cause. In such a case, the official misconduct was not a proximate cause of discovering the evidence, so the evidence was not "fruit of the poisonous tree." It was the "fruit" of the superseding cause.

*Mayfield*, 434 P.3d at 71 (citing *Strieff*, 579 U.S. at 257-58 (Kagan, J., dissenting)).

It noted that the "historical version of the attenuation doctrine was most likely to be satisfied where the intervening circumstances at issue were unforeseeable acts of independent free will," as highlighted by the seminal case of *Wong Sun*. *Mayfield*, 434 P.3d at 71. In *Wong Sun*, the defendant

was arrested without probable cause, released on his own recognizance after a lawful arraignment, but voluntarily returned several days later to confess. *Id.* (citing *Wong Sun*, 371 U.S. at 488, 491). In holding the confession admissible, the United States Supreme Court did not apply a strict "but for" causation test, but instead queried whether the evidence was obtained "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (quoting *Wong Sun*, 371 U.S. at 488) (quotation marks and additional citation omitted). The *Mayfield* Court continued:

> The defendant's voluntary decision to return to the police and give his confession may not have occurred but for his unlawful arrest. Nevertheless, the defendant's decision was an intervening circumstance that truly severed the chain of causation. "In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'" *Brown*[, 422 U.S. at 601] (quoting *Wong Sun*, 371 U.S. at 486[]).
>
> The attenuation doctrine thus began as a narrow exception to the exclusionary rule requiring a superseding cause for the discovery of evidence. However, as federal courts have increasingly focused on the exclusionary rule's deterrent purpose, they have adopted new exceptions and expanded existing ones, including the attenuation doctrine. The attenuation doctrine as applied by federal courts no longer asks only whether there was a superseding cause. Instead, "[t]he notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Id.* at 609[] (Powell, J., concurring in part).

*Mayfield*, 434 P.3d at 71-72.

Additionally, the Washington Supreme Court addressed the "purpose and flagrancy" factor, which the **Strieff** Court found "particularly significant." **Id.** at 72 (quotation marks and citations omitted). It noted that this factor is "directly related to the deterrence rationale underlying the federal attenuation doctrine," which, under Washington's exclusionary rule, is "completely incompatible" with its "requirement to suppress all illegally seized evidence, regardless of whether officers acted reasonably, negligently, or intentionally." **Id.** (citation omitted).

The **Mayfield** Court observed that "[t]his evolution in the federal attenuation doctrine has caused difficulties for Washington courts because although the narrow historical version of the federal attenuation doctrine may be compatible" with its state constitution, "the broad modern version is not." **Id.** at 72. It explained that the federal attenuation doctrine, in part, now "fails to protect individual privacy," gives police less incentive to possess the requisite level of cause if evidence is admissible despite the constitutional violation, and denies "a remedy to those whose privacy has been unconstitutionally invaded." **Id.** at 73 (citations omitted). At the same time, however, it recognized that a "but for" exclusionary rule "would make it virtually impossible to rehabilitate an investigation once misconduct has occurred" and that the "purpose of [its] state exclusionary rule is to protect individual privacy rights, not to permanently immunize suspects from investigation and prosecution." **Id.** Accordingly, the Washington Supreme

Court adopted a narrow state attenuation doctrine "to be applied only where the State proves that unforeseeable intervening circumstances truly severed the causal connection between official misconduct and the discovery of evidence." *Id.*

As our Supreme Court remarked in *Edmunds*, a "mere scorecard" of those states which have accepted and rejected *Strieff* "is certainly not dispositive of the issue in Pennsylvania." *Edmunds*, 586 A.2d at 900. "However, the logic of certain of those opinions bears upon our analysis under the Pennsylvania Constitution, particularly given the unique history of Article I, Section 8." *Id.* In this respect, I find it significant that the only jurisdiction to interpret its state constitution similarly to Pennsylvania, providing enhanced individual privacy protections as compared to the federal counterpart, found the attenuation doctrine as stated in *Strieff* incompatible with its state charter.

### 4. Policy Considerations

"[I]n analyzing any state constitutional provision, it is necessary to go beyond the bare text and history of that provision as it was drafted 200 years ago, and consider its application within the modern scheme of Pennsylvania jurisprudence." *Edmunds*, 586 A.2d at 901. I therefore proceed to examine whether the application of the *Strieff* attenuation doctrine to the facts of this case is consistent with the policy considerations underlying Article I, Section 8.

At the outset, I note the difficulty in balancing the individual privacy interest at stake—the right of the individual not to be detained without the requisite reasonable suspicion—against society's interest in promoting safe and effective law enforcement by apprehending fugitives from the law and securing criminal convictions. **See Henderson**, 47 A.3d at 804 ("The greatest difficulty in the enforcement of a prophylactic rule intended to guard individual liberties is on account of the competing value in society's interest in identifying and punishing wrongdoers."); **Mason**, 637 A.2d at 257 n.3 (stating that federal courts place less importance on the right of privacy than Pennsylvania courts and thus, they "balance the interests differently and reach a different conclusion as to the relative importance of privacy as against securing criminal convictions"). I also recognize the facial incongruity between Article I, Section 8's protection against illegal police interactions with citizenry on the one hand, and allowing police to provide a retroactive justification for an interaction that was otherwise illegal at its inception on the other.

The enhanced privacy protections provided by Article I, Section 8, as compared to the Fourth Amendment, heightens this consideration. In making this differentiation, our Supreme Court recognized that "**Edmunds** itself, in rejecting the 'good faith' exception to the exclusionary rule, calibrated the interests of society in securing criminal convictions and law enforcement needs versus privacy protections quite differently than does the United States Supreme Court." **Alexander**, 243 A.3d at 203.

*Edmunds* itself mandates that we cannot reflexively cede our citizens' constitutional rights to privacy to the needs of law enforcement and the concern that evidence may be suppressed. Contrary to the view that suppressing evidence represents an implicit hostility to police conduct, this Court in *Edmunds* viewed the matter quite differently:

> We have no reason to believe that police officers or district justices in the Commonwealth of Pennsylvania do not engage in "good faith" in carrying out their duties. What is significant, however, is that our Constitution has historically been interpreted to incorporate a strong right of privacy, and an equally strong adherence to the requirement of probable cause under Article I, Section 8. Citizens in this Commonwealth possess such rights, even where a police officer in "good faith" carrying out his or her duties inadvertently invades the privacy or circumvents the strictures of probable cause. To adopt a "good faith" exception to the exclusionary rule, we believe, would virtually emasculate those clear safeguards which have been carefully developed under the Pennsylvania Constitution over the past 200 years.

*Edmunds*, 586 A.2d at 899.

*Alexander*, 243 A.3d at 204. The *Alexander* Court observed that "[i]f the United States Constitution tips the scale towards law enforcement needs in analyzing Fourth Amendment questions, our own charter does not when addressing Article I, Section 8." *Id.* (citation omitted).

Concern about applying the attenuation doctrine in these circumstances plainly exists as it relates to improperly motivated police stops. As Justice Sotomayor pointedly stated in her *Strieff* dissent:

> This case allows the police to stop you on the street, demand your identification, and check it for outstanding [] warrants—even if

- 47 -

you are doing nothing wrong. If the officer discovers a warrant
…, courts will now excuse his illegal stop and will admit into
evidence anything he happens to find by searching you after
arresting you on the warrant.

*Strieff*, 579 U.S. at 244 (Sotomayor, J., dissenting). Examining the

particulars of the case, she observed:

> The officer did not ask Strieff to volunteer his name only to
> find out, days later, that Strieff had a warrant against him. The
> officer illegally stopped Strieff and immediately ran a warrant
> check. The officer's discovery of a warrant was not some
> intervening surprise that he could not have anticipated. Utah lists
> over 180,000 misdemeanor warrants in its database, and at the
> time of the arrest, Salt Lake County had a backlog of outstanding
> warrants so large that it faced the potential for civil liability. The
> officer's violation was also calculated to procure evidence. His
> sole reason for stopping Strieff, he acknowledged, was
> investigative—he wanted to discover whether drug activity was
> going on in the house Strieff had just exited.
>
> The warrant check, in other words, was not an "intervening
> circumstance" separating the stop from the search for drugs. It
> was part and parcel of the officer's illegal "expedition for evidence
> in the hope that something might turn up." *Brown*, 422 U.S.[]
> at 605 …. Under our precedents, because the officer found
> Strieff's drugs by exploiting his own constitutional violation, the
> drugs should be excluded.

*Id.* at 247 (Sotomayor, J., dissenting) (some quotation marks and citations

omitted). She continued, assessing that allowing the discovery of an

outstanding warrant to "sever[] the connection between illegal policing and

the resulting discovery of evidence" as a "remarkable proposition: The mere

existence of a warrant not only gives an officer legal cause to arrest and search

a person, it also forgives an officer who, with no knowledge of the warrant at

all, unlawfully stops that person on a whim or hunch." ***Id.*** at 247-48 (Sotomayor, J., dissenting).

As noted above in my discussion of ***Mayfield***, Justice Kagan also authored a dissent in ***Strieff***. In analyzing the second ***Brown*** factor— "whether any intervening circumstance broke the causal chain between the stop and the evidence"—she cited examples of states (including Pennsylvania) where outstanding arrest warrants number well in excess of one million to demonstrate that their discovery is foreseeable as "the run-of-the-mill results of police stops" and "what officers look for when they run a routine check of a person's identification and what they know will turn up with fair regularity." ***Id.*** at 258-59 (Kagan, J., dissenting). Of particular relevance to the matter pending before this Court, Justice Kagan concluded by observing the following:

> Consider an officer who … wishes to stop someone for investigative reasons, but does not have what a court would view as reasonable suspicion. If the officer believes that any evidence he discovers will be inadmissible, he is likely to think the unlawful stop not worth making—precisely the deterrence the exclusionary rule is meant to achieve. But when he is told of today's decision? Now the officer knows that the stop may well yield admissible evidence: So long as the target is one of the many millions of people in this country with an outstanding arrest warrant, anything the officer finds in a search is fair game for use in a criminal prosecution. The officer's incentive to violate the Constitution thus increases: From here on, he sees potential advantage in stopping individuals without reasonable suspicion— exactly the temptation the exclusionary rule is supposed to remove.

***Id.*** at 259-60 (Kagan, J., dissenting).

The concerns raised by Justices Sotomayor and Kagan resonate strongly with the underpinnings of Pennsylvania search and seizure jurisprudence. Because warrant checks are routinely performed during police stops,[19] I find it difficult to view the discovery of an outstanding warrant as somehow "intervening" such that it breaks the causal chain between an unlawful stop and the subsequent discovery of evidence during the search incident to arrest pursuant to the warrant. Further, as Justice Kagan recognized, adopting the attenuation doctrine as applied in **Strieff** to these factual circumstances presents the possibility of incentivizing police to conduct unlawful stops for the purpose of identifying individuals with outstanding warrants.

*     *     *

I would therefore conclude that the attenuation doctrine, as defined by **Brown** and applied by **Strieff**, is inapplicable under Article I, Section 8 in circumstances involving an unlawful stop that results in the discovery of an outstanding warrant, an arrest pursuant to that warrant, a search incident to

---

[19] **See Commonwealth v. Garcia**, 311 A.3d 1138, 1146 (Pa. Super. 2024) (stating that vehicle stops ordinarily include, inter alia, the officer checking a person's driver's license and determining whether the driver has any outstanding warrants) (citations omitted); **see also Commonwealth v. Cost**, 224 A.3d 641, 652-53 (Pa. 2020) (holding that the defendant was subject to an investigative detention and thus seized under the Fourth Amendment when an officer retained his identification card to conduct a warrants check). This should not be interpreted as a finding that the practice of performing warrant checks as a matter of course during investigative stops is not good policy.

that arrest, and the discovery of incriminating evidence.[20]  I reach this conclusion based upon our longstanding Article I, Section 8 jurisprudence interpreting our constitutional provision as providing greater privacy protections than the Fourth Amendment, the decision of the **Mayfield** Court—which is based upon a strikingly similar interpretation of Washington State's protection against unreasonable searches and seizures—and the relevant policy considerations.

Specifically, I cannot conclude that the discovery by law enforcement of an outstanding warrant during an unlawful stop is an "intervening circumstance" that attenuates the evidence seized in a search incident to arrest from the illegal stop.  Quite the opposite is true—the evidence is discovered as a direct result of the unlawful stop and inextricably linked to the police misconduct.  The general practice of conducting a warrant check during police encounters, coupled with the prevalence of outstanding arrest warrants, renders the discovery of a warrant during an illegal detention entirely foreseeable.  **See Strieff**, 579 U.S. at 247-50 (Sotomayor, J., dissenting), 259 (Kagan, J., dissenting); **Garcia**, 311 A.3d at 1146.

_____

[20]  I would stop short of declaring that the federal attenuation doctrine can never apply under Article I, Section 8, as that question is not presently before this Court.  As our Supreme Court made clear in its recent independent source doctrine jurisprudence, cases must be assessed on their individual circumstances.  **See Henderson**, 47 A.3d at 804.

To conclude otherwise would serve to erode the enhanced individual privacy rights embodied in Article I, Section 8 by allowing standard police conduct that regularly occurs during an investigative detention to bootstrap evidence that would otherwise be inadmissible because it was obtained during an unlawful encounter without reasonable suspicion. In other words, it would permit police to "gain … advantage from violating the individual's rights[.]" *See Katona*, 240 A.3d at 485 (citation and quotation marks omitted). Further, allowing the admission of evidence seized in these circumstances could serve to entice police to engage in suspicionless stops of our Commonwealth's citizens, knowing the stop could very well result in admissible evidence. *See Strieff*, 579 U.S. at 260 (Kagan, J., dissenting); *Ellis*, 469 P.3d at 75 (voicing the concern that "[t]he police could routinely carry out criminal investigatory detentions of all citizens without risking suppression of discovered evidence"); *see also Johnson*, 86 A.3d at 190 (recognizing that Pennsylvania's exclusionary rule "not only serve[s] the same privacy-based function it was deemed to serve in *Edmunds*, but also … serve[s] some generalized deterrence function").

The attenuation doctrine as applied in *Strieff* allows police to randomly stop citizens, request identification, and run warrant checks—all without reasonable suspicion to support the detention, knowing that if it leads to the discovery of an outstanding arrest warrant, any incriminating evidence found during the search incident to arrest will be admissible in a prosecution

unrelated to the lawful arrest. Unlike **Strieff**, our Commonwealth's jurisprudence does not "tip[] the scale towards law enforcement needs," **see** **Alexander**, 243 A.3d at 204, but rather, incriminating evidence found during a search incident to arrest that resulted from an illegal stop must be suppressed pursuant to Article I, Section 8.[21]

*Application to Rothhaar's Case*[22]

As stated above, I agree with the suppression court that Sergeant Tobie subjected Rothhaar to an unlawful investigatory detention made without the

---

[21] I also question the applicability of the fourth **Brown** factor—whether the official misconduct is purposeful and flagrant—under Article I, Section 8. As Pennsylvania's courts have long observed, whether an officer acted in good faith (or otherwise) is irrelevant to the constitutional analysis under our state charter, seemingly rendering this aspect of the federal **Brown** test incompatible with Article I, Section 8 of the Pennsylvania Constitution. **See** **Johnson**, 86 A.3d at 184, 187-91; **Edmunds**, 586 A.2d at 888, 895-906. As the **Strieff** Court found, the purposefulness and flagrance of the police misconduct was of special importance in its determination that the attenuation doctrine applied. **Strieff**, 579 U.S. at 242-43. And this factor stems directly from the deterrence rationale underlying the federal exclusionary rule: it "reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." **See** **id.** at 241.

Our High Court's decisions in **Katona** and **Henderson**, however, give me pause, as in those cases, majorities found that the "true independence" requirement stated in **Melendez** for the application of the independent source doctrine is only applicable in cases of "malfeasance" by law enforcement or "willful" or "egregious misconduct." **See Katona**, 240 A.3d at 479-80; **Henderson**, 47 A.3d at 805. As I base my determination upon the inapplicability of the second factor to the circumstances before this Court, I do not resolve this question.

[22] Rothhaar makes no argument before this Court of inadmissibility under the Fourth Amendment; therefore, I do not address it.

requisite reasonable suspicion. Sergeant Tobie's testimony further suggests that he performed the warrant check on Rothhaar as a matter of ordinary police practice. *See* N.T., 1/9/2023, at 18. If this Court were to allow admission of incriminating evidence discovered under the circumstances of this case, we would eviscerate the requirement that police have reasonable suspicion prior to conducting an investigatory detention of the citizens of our Commonwealth. *See Rice*, 304 A.3d at 1261. I would therefore conclude that the exclusionary rule operates to suppress the incriminating evidence seized incident to Rothhaar's arrest.[23]

## Conclusion

Based on the foregoing, I would hold that where police detain an individual without the requisite level of suspicion, during which they discover an outstanding warrant, resulting in the individual's arrest and a search incident to that arrest, revealing incriminating evidence or contraband, the attenuation doctrine does not apply to purge the taint of the illegal detention under Article I, Section 8 of the Pennsylvania Constitution. As Rothhaar was searched incident to his arrest pursuant to a warrant found during the investigative detention by police without reasonable suspicion, I would find all

---

[23] Unquestionably, notwithstanding the illegal stop, police were compelled to arrest Rothhaar on the outstanding warrant when they discovered it. *See Katona*, 240 A.3d at 485. But it does not follow that any evidence seized during the search incident to arrest is admissible in a later prosecution of Rothhaar for separate crimes that arise as a result of the evidence found during that search.

evidence that flowed from his illegal detention was subject to the exclusionary rule. Accordingly, I would conclude that Rothhaar's motion to suppress should have been granted under Article I, Section 8, his judgment of sentence vacated, and the case remanded for proceedings consistent with this dissent. On this basis, I respectfully dissent.